**Phillip Hollis WOOD, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

No. F–76–295.

Court of Criminal Appeals of Oklahoma.

Nov. 24, 1976.

Rehearing Denied Dec. 15, 1976.

Ed Morrison, Lawrence D. Taylor, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Doug Combs, Legal Intern, for appellee.

## OPINION

BLISS, Judge:

The Appellant, Phillip Hollis Wood, hereinafter referred to as defendant, was charged, tried before a jury and convicted in the District Court of Tulsa County, Case No. CRF-75-1213, of the crime of Murder in the Second Degree. In accordance with the verdict the defendant was sentenced to serve a term of from fifty (50) years to life under the direction and control of the Department of Corrections

of the State of Oklahoma. From said judgment and sentence the defendant has perfected his timely appeal. Subsequent to the filing of defendant's brief the trial court by order nunc pro tunc corrected its judgment and sentence to a term of from ten (10) years to life pursuant to 21 O.S. 1975 Supp., § 701.4 and *Layton v. State*, Okl.Cr., 551 P.2d 270.

Briefly stated the evidence adduced at trial is as follows: Pathologist Dr. Leo Lowbeer testified that on June 5, 1975, he performed an autopsy upon the body of the deceased and discovered numerous lacerations and bruises evidencing a violent struggle and that the fatal wound was a stab wound to the right breast that severed the aorta. Referring to photographs admitted into evidence Dr. Lowbeer referred to certain wounds as defense wounds obtained when a victim attempts to defend himself against an assailant. He further testified that the blade of a paring knife admitted as state's Exhibit No. 5 fit perfectly into the stab wounds. On cross-examination Dr. Lowbeer related that the defendant's blood group was group O.

Louie C. Moore then testified that on June 4, 1974, he was employed as a food handler at the Tulsa Club and that shortly after 2:00 p.m. he sold some charity raffle tickets to the decedent in the presence of the defendant. Wesley T. Lindsay then testified that he was employed by the Tulsa Club as head pantry chef, that the decedent worked as his assistant and that the defendant worked as a sandwich man. He further related that he observed the raffle ticket transaction at approximately 1:30 p. m. and that at 1:45 p.m. the decedent left his station in the 7th floor kitchen and the defendant left approximately five minutes later. At approximately 2:20 p.m. he was called down to the 5th floor cook's dressing room where he observed the decedent lying on the floor and the defendant standing among other employees. The defendant was then without his cook's coat and it appeared that he had changed into a clean pair of cook's trousers.

Willie Hanner then testified that he was a busboy at the Tulsa Club on June 4, 1975, and that between 2:00 and 2:15 p.m. he was in the busboy's dressing room immediately adjacent to the cook's dressing room and overheard the sounds of a fight coming from the cook's dressing room. He did not investigate.

Larry Dawson then testified that on the date in question he was employed as head of the salad department on the 9th floor and that at approximately 2:20 p.m. the defendant rushed into the room wearing a clean uniform and stated, "Oh wow, somebody has killed Poncho." The defendant appeared excited and nervous. The witness took the elevator down to the 5th floor and there he met the defendant who had taken the back stairs. The defendant used his key to enter the cook's dressing room where Dawson observed the decedent covered with blood and lying in a commode stall. Shortly thereafter the manager and other employees arrived.

Ray Crussel a chef at the Tulsa Club related that between 2:00 and 2:30 p.m. on the 4th the defendant had come into the kitchen "hollering" that someone had killed Poncho. Crussel described the decedent as being five feet nine inches tall and weighing approximately 130 pounds and the defendant as being approximately the same height and weighing approximately 300 pounds. He further stated that he went with other employees to the cook's dressing room and identified state's Exhibit No. 6 as the decedent's "french knife" that he had observed lying on the floor along with a long tapered knife sharpener which also belonged to the decedent. He then identified a pocket knife as being like one the defendant had in his possession about a year before the incident and stated that he saw a watch lying on the floor about a foot from the french knife. Michael Crawshaw then testified that he was the general manager of the Tulsa Club, that at approximately 2:20 p.m. he was summoned to the cook's dressing room where he found the deceased face down in a tremendous pool of blood in a commode cubicle and that a few days later he discovered the pocket knife in the crawl space above the ceiling of the cook's dressing room.

Detective John Hickey then related that at about 3:00 p.m. he went to the Tulsa Club to assist in the investigation and observed a broken watch and a butcher knife on the floor of the dressing room. He further related that the following day he returned to the club and assisted in the recovery of a pocket knife and a broken butcher steel found in the crawl space over the dressing room ceiling. He further discovered two small pieces of the butcher's steel on the floor of the dressing room behind the lockers. He then identified state's Exhibit No. 12 as shoes he had obtained from the defendant's locker. Officer John McSherry then identified numerous photographs he took off the body at the hospital and further identified hair samples he had taken from the decedent and the defendant. Officer Frank Wincent then testified that he secured from the scene two pairs of cook's trousers and one cook's jacket belonging to the defendant, one watch with a broken wrist band, a broken latch of a lock, a butcher knife, a pocket knife and a butcher's steel with two broken pieces. He further stated that all but the watch and the knives were forwarded to the FBI laboratory in Washington along with four vials containing hair strands and other substances found at the scene and a pair of men's shoes belonging to the defendant.

John Hippard then testified that he was a special agent assigned to the FBI laboratory in Washington and that his primary function was to conduct microscopic comparison and examination of hairs, fibers and other related materials. He related that he made microscopic comparisons of hair samples of the decedent and hair recovered from the watchband, the cook's jacket, the cook's trousers, the shoes and the container in which the broken butcher steel had been delivered and that all hair strands matched the sample of the decedent's hair. He could not, however, testify

positively that all of the hair came from one particular person to the exclusion of all others.

James Porter, Jr. then testified that he was assigned to the FBI laboratory in Washington, that his work involved examination of stains to determine the presence of blood and that he conducted laboratory tests on two pairs of cook's trousers, a cook's jacket, shoes and a butcher steel. Three stains on the trousers and jacket were identified as group O human blood. On cross-examination Porter stated that 45 percent of Americans have group O blood. The state then rested.

The defendant testifying in his own behalf then stated that he had been convicted of robbery in 1971 and that on June 4, 1975, he was employed by the Tulsa Club as a sandwich man in the 7th floor kitchen where he and the decedent worked side by side. On the 4th at approximately 2:00 p. m. he left the 7th floor kitchen to take his regular 30 minute break. Between 2:15 and 2:20 he went to the cook's dressing room on the 5th floor where he found the dressing room door unlocked and observed blood on the floor and a foot protruding from a commode stall. Rushing to investigate he opened the door to the stall, lost his balance and fell to the floor getting blood on his uniform. Due to his prior conviction and his fear of appearing suspicious and also in an effort not to frighten women employees he quickly changed into a clean uniform and then went to inform his supervisor. He further testified that he did not kill the decedent.

The defense then recalled Larry Dawson who stated that he had been convicted in 1967 of attempted burglary and that after the body had been removed by the ambulance crew he noticed other employees who had blood on their clothing.

The defendant's first assignment of error urges that the trial court erred in overruling the defendant's demurrer to the evidence. Under said assignment the defendant further argues that the evidence was wholly insufficient to support the judgment and sentence.

■ After a thorough reading of the transcript of the testimony it is obvious that the conviction is based upon circumstantial evidence. However, in *Jones v. State*, Okl.Cr., 523 P.2d 1126, we held that where circumstantial evidence is relied upon to prove a crime, it is not required that the circumstances proven shall exclude all possibility of innocence, but only that they shall be inconsistent with any reasonable hypothesis other than that of guilt. After reviewing the entire record we are of the opinion that the evidence was sufficient to support the jury's conclusion that the defendant was guilty of the crime charged. The credibility of the witnesses and the weight and value to be given their evidence is for the determination of the jury, and where the evidence and reasonable and logical inferences and deductions to be drawn therefrom are sufficient to convince the jury beyond a reasonable doubt of the guilt of the defendant then this Court will not disturb the verdict for insufficiency of evidence. *Wright v. State*, Okl.Cr., 500 P.2d 582. The trial court sufficiently and adequately instructed the jury concerning the treatment of circumstantial evidence in the instant case and the defendant's first assignment of error is without merit.

■ The defendant's second assignment of error contends that the trial court erred in overruling the defendant's motion for mistrial after the trial court attempted to define the term "reasonable doubt" before the jury during voir dire.

During the initial portion of the voir dire the trial court asked the jury panel the following questions:

". . . The only evidence you will consider will come from the witness stand, and nothing any of the attorneys say will be considered as evidence, but the only evidence you will consider will come from the witness stand, and the

Court will instruct you as to the law on this matter. Do you understand that?

Do you further understand that the defendant is presumed innocent until the State proves his guilt beyond a reasonable doubt?

This does not mean beyond any doubt whatsoever. It means beyond a reasonable doubt.

Do you further understand that he doesn't have to take the stand and say anything in his defense; it's up to the State to prove his guilt beyond a reasonable doubt.

Do you know anything about this case, other than what I have told you?

Appearing for the State of Oklahoma is Mr. Ron Shaffer and Mr. Bill Mussmann of the District Attorney's staff. Do you know either Mr. Shaffer or Mr. Mussmann, or anybody in the District Attorney's office?"

After the above comments by the trial court defense counsel approached the bench and moved for mistrial upon the grounds that the trial court defined the term "reasonable doubt." The motion for mistrial was overruled.

The record further reflects that during the voir dire of the jury by defense counsel Taylor the following transpired:

"MR. TAYLOR: And most all of you have, and as the prosecutor mentioned, whereas some of you have served on civil cases, and some of you have served on criminal cases, you must understand that the burden of proof in a civil and criminal case are entirely different; that in a civil case, in order to find for the plaintiff, it's simply a preponderance of the evidence. If the evidence were put on a scale, a mere tipping of the scale, or a preponderance of the evidence will allow you to find for or against the plaintiff, whereas in a criminal matter, like we're here on today, a burden of proof is beyond a reasonable doubt and to a moral certainty, that in order to warrant a conviction in this matter, the State has the burden and the sole burden of proving to your satisfaction to convince you beyond a reasonable doubt and to a moral certainty.

Is there anyone who doesn't understand the difference between the burden of proof in a civil and criminal case?

Is there anyone that has any quarrels or qualms about the difference in the burden of proof between a criminal and a civil case?"

"MR. BROWN: When you say that it should be beyond any reasonable doubt, that's the same as beyond any shadow of a doubt?"

"MR. TAYLOR: It's a very difficult term to define, but —"

"MR. SHAFFER: Excuse me, Your Honor. It is not beyond a shadow of a doubt."

"MR. MORRISON: Your Honor, I also object to his pronouncement. The Court is the only one that makes rulings. May I approach the bench?"

"THE COURT: Yes."

"MR. MORRISON: Your Honor, as far as defining, we have got into this, and everybody wants to know what reasonable doubt is. If the Court were to say, 'It's a doubt founded upon reason', if you want to instruct them on that. Apparently, we're in the position of having something half defined, and I would object to any further comments in defining reasonable doubt, and ask that the Court admonish the jury not to consider what has been said about reasonable doubt, but to inform them that they will be duly instructed as to Oklahoma law as to what reasonable doubt is."

"MR. SHAFFER: If Your Honor please, by the juror's question and counsel's silence as to that question, it leaves the inference that it may very well be beyond a shadow of a doubt."

"MR. MORRISON: I am asking that the Court clear it up."

"THE COURT: I'll clear it up."

"THE COURT: Mr. Brown, and other members of the jury, it's beyond a reasonable doubt. That does not mean beyond any doubt whatsoever, and the Court will give you an instruction as to the Oklahoma law on what reasonable doubt is."

In support of his assignment of error the defendant cites *Fellows v. State*, Okl.Cr., 508 P.2d 1089 and *Wilson v. State*, Okl.Cr., 403 P.2d 262. In each case the issue of defining reasonable doubt arose out of an instruction submitted to the jury after completion of all testimony. That is not the issue before us and both cases are distinguishable.

In the instant case the trial court initially admonished the jury that it would instruct them upon the law. After juror Brown asked his question, more confusion would have arisen in the minds of the jury if the trial court had failed to make the explanation set out above. It should also be noted that defense counsel asked the trial court to "clear up" the matter and that defense counsel Taylor made an attempt to define "reasonable doubt" as a "moral certainty."

It is therefore our opinion, considering all of the comments made above that the defendant was not prejudiced by the remarks. The trial court initially admonished the jury that it would instruct them upon the law, defense counsel subsequently raised the issue and asked that it be cleared up, and the trial court after making its explanation above set forth did not submit an instruction to the jury defining reasonable doubt. The error complained of in the instant case was harmless and the defendant's second assignment is without merit. See also *Wald v. State*, Okl.Cr., 513 P.2d 330.

The defendant's third assignment of error urges that the trial court erred in overruling the defendant's objection to the introduction into evidence of four photographs depicting the head area and hand of the decedent for the reason that they had no probative value and were intended merely to inflame the passions of the jury. Although the record before us contains xerox copies of the photographs pursuant to the stipulations of all parties, the copies are reasonable institutions upon which this Court can base its judgment.

■ In support of his argument defendant cites *Oxendine v. State*, Okl.Cr., 335 P.2d 940 for the proposition that if the pictures of a homicide victim are gruesome or ghastly and carry danger of prejudice they are inadmissible unless they are relevant to some material issue and would reasonably assist the jury in the determination of the defendant's guilt, and such relevancy outweighs the danger that the jury would substitute emotion for reason. This is an accurate statement of the law.

■ However, in the instant case the four photographs objected to tend to corroborate the testimony of Dr. Lowbeer concerning defensive wounds to head and hands and the testimony of Willie Hanner relating to his overhearing a fight in the cook's dressing room. The photographs are further relevant since they tend to prove the element of premeditated intent. It is our opinion that the photographs are not so gruesome as to outweigh their relevancy and were properly admitted by the trial court. See *Rowbotham v. State*, Okl.Cr., 542 P.2d 610.

The defendant's fourth assignment of error contends that the trial court erred in overruling the defendant's objections to the late endorsement of state's witness John McSherry after the trial began.

■ As cited by the defendant, *Griffin v. State*, Okl.Cr., 490 P.2d 1387, holds that the trial court may in the exercise of judicial discretion permit the name of an additional witness to be endorsed at the time the trial begins or even after the trial has commenced. However, if such additional witness will require defendant to produce additional evidence he is entitled to a continuance. In the instant case the defend-

ant failed to request a continuance and it would appear that the defendant was not prejudiced by the late endorsement.

The defendant's fifth assignment urges that the trial court erred in denying the defendant's request to examine FBI laboratory technician James Porter concerning his qualifications as an expert prior to the trial court receiving the expert testimony.

■ This Court has held on numerous occasions that whether or not a witness is allowed to testify as an expert rests largely in the discretion of the trial court and its discretion will not be disturbed on appeal unless it clearly appears that said discretion has been abused. *Box v. State*, Okl. Cr., 541 P.2d 262 and *Smith v. State*, Okl. Cr., 509 P.2d 1391. In the instant case the witness testified concerning his education and his training at the FBI laboratory in Washington. He further stated that he would conduct several thousand examinations in a year's time and that he had testified approximately 30 times as an expert witness in both state and federal prosecutions. On cross-examination defense counsel was afforded wide latitude in questioning the witness with regard to the tests performed and his knowledge of the subject. After reading all the testimony we cannot say that the trial court abused its discretion in refusing to allow defense counsel to voir dire the witness concerning his qualifications. A proper instruction concerning the weight and credibility to be given expert testimony was submitted to the jury and the defendant's fifth assignment is without merit.

■ The defendant next urges that the trial court erred in improperly applying the law in sentencing the defendant to a term of fifty (50) years to life imprisonment upon a finding by the jury of the defendant's guilt of second degree murder. In our recent decision *Layton v. State*, Okl. Cr., 551 P.2d 270, we held that it was the Legislature's intent that the only sentence permissible under 21 O.S.1973 Supp., § 701.4 is an indeterminate sentence of ten

(10) years to life imprisonment. Therefore the original sentence was erroneous. However the record reveals that on or about August 26, 1976, the trial court entered a Judgment and Sentence Nunc Pro Tunc correcting the original sentence and properly sentencing the defendant to an indeterminate term of ten (10) years to life. Said assignment of error is therefore moot.

■ The defendant next urges that the trial court erred in overruling the defendant's motion for an evidentiary hearing on his motion to suppress prior to the introduction of the pair of shoes found in the defendant's locker. We need not determine that issue in the instant case since the error, if any, would be harmless. The shoes were merely cumulative evidence since the cook's coat and trousers were properly admitted. In *Contabile v. State*, Okl.Cr., 513 P.2d 588, this Court, citing numerous other opinions, held that the admission of evidence which is merely cumulative will not be held reversible error even though the evidence might be inadmissible. In the instant case the blood stains and hair samples found on shoes are not nearly as prejudicial to the defendant's position as the blood stains and hair samples found upon the defendant's uniform. Therefore the error, if any, was harmless since excluding the shoes from evidence would not have changed or influenced the jury finding of guilty. *Williams v. State*, Okl.Cr., 491 P.2d 787.

The defendant next urges that 21 O.S. 1973 Supp., § 701.4, which reads as follows, to-wit:

"Every person convicted of murder in the second degree shall be punished by imprisonment in the State Penitentiary for not less than 10 (10) years nor more than life. The trial court shall set an indeterminate sentence in accordance with this section on a finding of guilty by the jury of murder in the second degree."

is unconstitutional for the reason that it deprives the defendant of his right to have the jury assess punishment. We disagree.

**444**

Under Article II, Section 19 of the Oklahoma Constitution, as amended, the right of a trial by jury remains inviolate. However, the Constitution does not require that the jury, once the issues of fact have been presented to it and it has determined that an accused it guilty of the crime charged, must assess punishment. As stated in 23A C.J.S. Criminal Law § 1141, where the fine or period of imprisonment is fixed by law, it is usually for the court and not for the jury to assess it unless such power is conferred on a jury by constitutional or statutory provision. In Oklahoma a defendant's right to have a jury assess punishment is a matter of statute, 22 O.S. § 926 and § 927.

It should also be noted that in the syllabus of the Court in *Burtt v. State,* 64 Okl. Cr. 68, 77 P.2d 580, this Court held that § 927, which permits the trial court to assess punishment when the jury fails to do so, is not unconstitutional as depriving a defendant of his right to trial by jury.

As stated above, in *Layton,* supra, we recently held that only one sentence was permitted under 21 O.S.1973 Supp., § 701.4 and that is an indeterminate sentence of ten (10) years to life imprisonment. Therefore, after a factual determination of guilt in a prosecution for second degree murder, the jury has no further issue to determine. It certainly was not the intent of the Legislature to require the jury to go through a mere formality. In the instant case no material right of the defendant was prejudiced by the trial court assessing punishment and the defendant's assignment of error is without merit.

The defendant's last assignment urges that the trial court erred in overruling the defendant's motion for new trial upon the ground that the accumulation of errors and irregularities in the trial, when considered as a whole, deprived the defendant of a fair trial. Of course, we must disagree. Since we have found that all other assignments of error are without merit it follows that this assignment is similarly without

merit. *Haney v. State,* Okl.Cr., 503 P.2d 909.

From a thorough examination of the record it is our opinion that the defendant received a fair and impartial trial before a jury, that no material right of the defendant was prejudiced and that the corrected judgment and sentence should be, and the same is hereby AFFIRMED.

BRETT, P. J., and BUSSEY, J., concur.