1998 OK CR 19

**Stephen Edward WOOD, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

No. F–95–759.

Court of Criminal Appeals of Oklahoma.

March 11, 1998.

Rehearing Denied April 20, 1998.

Ray Jones, Cordell, for Defendant at trial.

Dan Deaver, Assistant District Attorney, Pat Versteeg, Assistant District Attorney, Richard Dugger, District Attorney, Mangum, for the State at trial.

Anne Moore, Appellate Defense Counsel, Norman, for Appellant on appeal.

W.A. Drew Edmondson, Attorney General, Robert Whitaker, Assistant Attorney General, Oklahoma City, for Appellee on appeal.

### *OPINION*

JOHNSON, Judge:

¶1 Stephen Edward Wood, hereinafter referred to as Appellant, was tried and convicted by jury of the crime of Murder in the First Degree (Malice Aforethought) in violation of 21 O.S.1991, § 701.7(A), in Case No. CRF–95–03(B) in the District Court of Greer County before the Honorable Charles Goodwin, District Judge. The jury found four aggravating circumstances: (1) the defendant had a prior conviction of a violent felony; (2) the defendant knowingly created a great risk of death to more than one person; (3) the defendant committed the murder while serving a sentence of imprisonment on a felony conviction; and (4) there existed a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. The jury set punishment at death by lethal injection. The trial judge sentenced Appellant in accordance with the jury's recommendation. From this Judgment and Sentence, Appellant has perfected this appeal.

### FACTS

¶2 John Brigden, an inmate at the Oklahoma State Reformatory in Granite, Oklahoma, was stabbed to death in his cell on June 12, 1994. Brigden was serving time for lewd molestation and rape by instrumentation. The following sets forth the testimony in the order presented at trial.

### Inmate Robert Boulet

¶3 Robert Boulet testified that Appellant approached him at 6:30 a.m. on June 12, 1994, asking whether he had a knife Appellant could buy. Boulet told Appellant he did not have one. Shortly thereafter, David Chatham approached Boulet and asked him the same thing and Boulet gave him the same answer.

¶4 Later in the day, while downstairs in the victim's building (Building A), Boulet heard someone scream, "Assault! Assault!" from upstairs. Boulet went upstairs and observed co-defendant David Chatham standing near the victim's cell in front of a big window. He also observed Appellant come out of the victim's cell. After Appellant and Chatham left, Boulet looked into the victim's cell and observed the victim lying on the floor with blood coming from his chest.

### Inmate Michael Hendricks

¶5 Michael Hendricks testified that Appellant, Chatham, and another inmate, Thomas Brumly called themselves the "White Supreme Brotherhood" or "White Supreme Power." He heard Appellant, Chatham, and Brumly brag about taking things from the victim. They also discussed a contract being out on the victim. Hendricks testified that on June 12, Appellant, Chatham, and Brumly told him they were going to kill the victim. Hendricks did not believe them. Around 6:00 p.m., Hendricks saw Chatham and Appellant in their cells. They told Hendricks that they were going to kill the victim. When Hendricks realized they had a knife, he followed them to the victim's building. Hendricks saw Appellant and Chatham go into the victim's building, up the stairs, and into the victim's cell. He then heard loud thumping. Hendricks then saw Appellant, Chatham, and others running out of the

building. Hendricks observed Chatham run one direction and Appellant another. Hendricks followed Chatham and saw him throw a paper sack into a garbage truck. After announcement of an emergency lock-down, Hendricks observed Appellant and some others standing around nervously and heard them say, "Well, he got what he deserved...."

### Inmate David Crawford

¶ 6   Around 9 or 10 a.m., David Crawford, while in Chatham's cell, which was next to Appellant's cell, took part in a discussion, mostly instigated by Chatham, about killing the victim. Crawford testified that he gave Appellant the knife to carry out the crime. The three men went to the victim's building but could not kill him at that time because his cell partner was present.

¶ 7   While they were eating dinner, Crawford heard Appellant and Chatham insinuate that they would kill the victim that evening while everyone was at dinner. The three men went back to the victim's building at around 6:30 p.m. Crawford testified that he took his position by a window downstairs while Appellant went up to the victim's cell. Crawford saw Chatham go into inmate James Murphy's cell (next door to the victim's) and shut the door. Crawford testified that he saw Appellant go into the victim's cell. Crawford then began to move away from the window, and as he did he heard the victim yell, "Assault!" and scream several times. Shortly thereafter, the knife came out the window, but Crawford did not have a chance to pick it up because a correction officer was approaching.

### Officer Terry New

¶ 8   Officer New testified that before he went up on top of the victim's building, around 6:30 p.m., he observed that the victim's cell door was open, which was unusual. But, when he looked in on the victim, everything seemed fine. The victim said nothing to Officer New at that time. Officer New went up on top of the building and observed a man below pacing nervously. He then heard screams coming from the building.

¶ 9   As Officer New started down from the roof, he saw a knife bounce on the ground near the place where he had seen the man pacing. The man, David Crawford, knelt to pick up the knife, but when he heard Officer New's keys jingling as the officer hit the ground, threw the knife at Officer New and ran. Officer New picked up the knife. He observed Appellant running out of the building. When Appellant saw Officer New, he stopped, looked at Officer New, threw his hands up, and took off running in the other direction.

¶ 10   Officer New then entered the building. Officer Janet Alexander let him into the control room where he left the knife and asked Officer Alexander to watch it. Officer New, along with Lieutenant Simons, later reclaimed the knife. Simons took the knife into custody and turned it over to OSBI Agent Joe Ferrero the next morning. No fingerprints were found on the knife.

### Officer Janet Alexander

¶ 11   Officer Alexander was in the control panel of the victim's building when she heard the yelling begin at around 7:10 p.m. She walked to the victim's pod and noticed a lot of prisoners yelling and running around. Officer Alexander intended to secure the pod, but had trouble closing the control room door. By the time she got the control room door closed, all the inmates had left "3–pod." She observed only one inmate, a white male with brown hair and a mustache, about 6 feet, run down the stairs and out of "3–pod."

### Officer Jimmy Rodriguez

¶ 12   Officer Rodriguez noticed David Chatham standing near the victim's cell as he and Officer New approached it. Upon entering the cell, the officers observed the victim kneeling between the wall and the toilet. There was blood on the floor around the victim from the toilet to the door of the cell. No one else was in the cell at that time. After the nurse arrived, they tried to administer CPR. The victim was then taken to the infirmary, and finally sent by ambulance to Hobart Hospital, where he died.

### Inmate James Murphy

¶ 13   James Murphy was a friend of the victim in protective custody on a conviction for lewd molestation.   Murphy's cell was next to the victim's.   Murphy testified that David Chatham knew of his friendship with the victim and would come to his cell and ask him questions about the victim.   Chatham would then go over to the victim's cell and leave.   Chatham told Murphy that he and others would take things from the victim for fun.   Murphy testified that Chatham came by frequently two to three days before the murder and would always go by the victim's cell.

¶ 14   On the day of the murder, Chatham and Appellant came to his cell around 6:30 p.m.   The victim was on the telephone, so the two men walked in and out of his cell.   The victim walked back to his cell when he got off the phone.   Appellant made a comment to Chatham that he could not hear.   Chatham then pulled out a knife and gave it to Appellant.   Appellant then told Chatham to make sure Murphy stayed in his cell.

¶ 15   Murphy stood with Chatham at his cell door where he saw Appellant walk over and stop by a window.   Murphy then went back into his cell and Chatham told him to sit down.   Murphy sat down, but later started to get back up.   Chatham pulled up his shirt where he had another knife and told Murphy to mind his own business, stay there, and sit down.   Murphy obeyed.   Murphy then heard the victim cry, "Praise God!" two or three times.   Murphy got up and went to his cell door.   Looking past Chatham, Murphy saw the victim turn towards his own door and Appellant standing behind him.   Appellant was "slinging" his knife at the victim.   Murphy then backed up so that he would not get caught looking, but did observe Appellant stab the victim once, pull back, and begin to stab a second time.

¶ 16   Returning to his cell door, Murphy saw Appellant leave the victim's cell, throw a knife out the window, and run past him.   Appellant then ran down the stairs and out the door.   Murphy walked to the victim's cell after Chatham left and saw the victim lying on the floor where there was blood all over.

### Inmate John Crosson

¶ 17   John Crosson saw Appellant, Chatham, and Crawford in the victim's building around 2:00 p.m.   He asked them what they were doing there.   Chatham replied they were there to do some collecting and showed Crosson a knife.   Crosson recognized the knife as one he had bought from Chatham a month earlier.   Around 7:00 p.m., Crosson saw Appellant and Chatham in the victim's building again.   Chatham was on the "top run" walking back and forth.   Crosson again asked Chatham why he was there and was given the same answer.   While attempting to get in the control room, Crosson observed Chatham hand Appellant the knife in the day room.

¶ 18   Appellant and Chatham went upstairs.   Chatham went to Murphy's cell and Appellant put the knife in his waistband and walked past Murphy's cell to that of the victim.   The victim's door was open.   Appellant pulled the knife out then turned and looked directly at Crosson who was still watching.   Crosson heard the victim scream like a woman as Appellant entered the cell.   Appellant exited the cell and threw the knife out the window.   As he passed Murphy's cell, he hit the door with his fist.   Crosson left the building and saw Appellant outside running.

### Inmate James Hollenbeck, Jr.

¶ 19   James Hollenbeck testified he was in the victim's building when he heard the first scream.   He rushed upstairs and looked into the victim's cell where he observed Appellant pounding on the victim.   Hollenbeck did not see a knife.   Hollenbeck walked away from the cell towards a rail.   He observed Appellant run out of the cell.   The victim then stumbled out, holding his chest.   When the victim fell, Hollenbeck went back to his cell because a guard was coming.

### Officer James Haynes

¶ 20   Officer Haynes testified he and Sgt. Maddux searched Appellant's cell at approximately 9:08 p.m.   A shirt with blood on it was found under the mattress of the top bunk.   [Haynes initially assumed that Appellant occupied the top bunk because his cell mate

was known to always occupy the bottom bunk.] The officers then confirmed with the cell mate that the top bunk was Appellant's. The shirt was later turned over to Agent Ferrero.

### Dr. Marsha Eisenberg, Roche Biomedical Laboratory

¶ 21  Dr. Marsha Eisenberg, a forensic testing specialist at Roche Biomedical Laboratory in North Carolina testified that utilizing the PCR method of DNA analysis, it was determined that the blood-stain on the shirt found under Appellant's bunk matched that of the victim.

### Inmate Teddy Graham

¶ 22  Graham testified that on January 11, 1995, in a conversation with Appellant, he asked Appellant why he had gotten involved with Chatham in a murder. Appellant told Graham that Chatham had pointed out the victim as a target for robbery. Appellant had gone to rob the victim of a gold watch and wedding ring. Appellant told Graham that Chatham watched someone in another cell to keep him from coming to assist the victim. Appellant told Graham that he asked the victim for the watch, but the victim refused to give it to him. Appellant then added that the victim played into his hands because he liked to kill people anyway, so he killed the victim by stabbing him in the leg and then all over. Appellant told Graham the victim screamed and yelled, crying like a baby.

### JURY SELECTION ISSUES

¶ 23  Appellant contends, in his first proposition, that the trial court committed reversible error when, during *voir dire,* panel members were instructed to disregard the circumstances of the victim's criminal past as irrelevant to the sentencing determination. Panel members who considered the victim's status as a child molester to be a mitigating factor were excluded for cause from the jury. Thus, Appellant urges, he was sentenced by a jury composed of men and women who were prohibited from considering mitigating evidence and had, in fact, agreed not to consider the mitigation before the trial even

began. Appellant sets out five sub-propositions. As all the sub-propositions of proposition one are interrelated, they will be considered together.

¶ 24  The thrust of Appellant's argument is that the potential jurors' knowledge of the victim's past criminal activity, intertwined with "death qualifying" questions asked by the prosecution, made it impossible for the panel to differentiate their overall views on the death penalty from their possible application of the death penalty in this specific case. In other words, Appellant urges that, but for their knowledge of the victim's criminal behavior, some potential jurors would not have been excused for cause because they had no general objection to the application of the death penalty, but an objection to applying it in this specific case.

¶ 25  Appellant relies on the standard for dismissal of a juror for cause that was promulgated by the Supreme Court in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). In *Witt,* the Supreme Court reaffirmed its holding in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and laid out the standard of exclusion of a prospective juror for cause as "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt,* 469 U.S. at 424, 105 S.Ct. 844.

▮ ¶ 26  Appellant asserts that the Prosecution's questions to the prospective jurors were improper in that they were directed to specific circumstances present in this case. The State, after a comment from one juror who stated that she would not be able to apply the death penalty in this case because of her knowledge of the victim's criminal past, began to query the rest of the panel to ascertain whether some of them had the same reservation. We do not find this was improper questioning considering the notoriety of the victim, and the probability that most of the jury was aware of the circumstances surrounding the victim. Furthermore, the standard as set out in *Witt* allows for dismissal for cause in situations where the juror's views would "prevent or substan-

tially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* In this case, the jurors who were dismissed for cause expressly stated that considering the nature of the victim's crime, they would not be able to consider the death penalty as punishment for his killer. This position clearly prevented and substantially impaired the prospective jurors in the performance of their duties in accordance with their instructions and oath in that they could not impartially consider the State's request to impose the death penalty. Thus, the trial court's dismissal of the prospective jurors for cause survives the standard laid out by the United States Supreme Court in *Witt.*

¶ 27 As to Appellant's contention that the process by which the jury was impaneled deprived him of relevant mitigating evidence, we do not agree. Appellant relies on *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) in which the Supreme Court held that:

> [I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the *individual offender* and the circumstances of the *particular* offense as a constitutionally indispensable part of the process of inflicting the penalty of death. (emphasis added)

*Lockett,* 438 U.S. at 604, 98 S.Ct. at 2964, 57 L.Ed.2d at 989 (citations omitted). We find Appellant's reliance on *Lockett* misplaced. Rather than offer any aspect of *his* character or record and any of the circumstances of the offense with which he is charged, Appellant offers the victim's character and the offense for which the victim was convicted.

¶ 28 Appellant cites no authority which would lead this Court to conclude that past activity of a victim, which has no bearing whatsoever on "the existence of any fact that is of consequence to the determination of the action more probable or less probable," is relevant mitigation evidence. *Id.* Further, this Court declines to set a precedent that will endorse vigilante justice against individuals whose lives are morally repugnant. This proposition of error must fail.

¶ 29 In his second proposition of error, Appellant avers that the trial court abused its discretion in denying his Motion for Individual Voir Dire of Jurors Concerning the Death Penalty and Pre–Trial Publicity, and that as a result, he was denied a trial before a fair and impartial jury. There is no right to individual *voir dire.* *Fontenot v. State,* 881 P.2d 69, 75 (Okl.Cr.1994). Further, it is within the discretion of the trial court whether to allow individual *voir dire. Trice v. State,* 853 P.2d 203, 209 (Okl.Cr.), *cert. denied,* 510 U.S. 1025, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993). Appellant has not demonstrated that the trial court abused its discretion in denying his motion. Thus, this proposition of error must fail. See above discussion of Proposition I.

¶ 30 In Appellant's third proposition, he argues that reversible error occurred when the trial court did not excuse two potential jurors who would automatically vote for the death penalty. However, the two potential jurors in question, Thompson and Scott, both stated that they would consider all the punishment options and the totality of the evidence. In *Stewart v. State,* 757 P.2d 388, 392 (Okl.Cr.1988), this Court held that no *sua sponte* dismissal of a juror is required when a potential juror does not unequivocally state that he is unwilling to follow the law. In the instant case, not only was there no unequivocal statement, but the potential jurors affirmatively stated that they would follow the law. In addition, defense counsel passed the jurors for cause, thereby waiving any error. *Id.* This proposition of error is meritless.

¶ 31 In his fourth proposition of error, Appellant claims that the trial court's failure to preserve the jury questionnaires as part of the record deprived him of his Eighth and Fourteenth Amendment rights. Appellant relies on *Van White v. State,* 752 P.2d 814, 821 (Okl.Cr.1988), in which this Court held that "the failure of the *Van White v. State* court reporter to transcribe *voir dire* as requested ..." was grounds for reversal. We reasoned that the transcript was necessary in order to effectuate mandatory sentence review.

¶ 32 Appellant's reliance on *Van White* is misplaced because in that case, there was *no record at all* of the *voir dire* proceedings. Thus, on review, it was impossible to determine whether the death penalty was being imposed in an arbitrary and capricious manner. There was no way in which to determine what questions were asked, or what answers were given in order to evaluate the defendant's claims as related to jury issues. In the instant case, the failure of the trial court to maintain the jury questionnaires is not comparable to having no transcript of *voir dire* proceedings. The jury questionnaires were filled out by potential jurors prior to the *voir dire* proceedings where they were sworn in. The questionnaires were furnished to the attorneys as a guide and to expedite the process and were not completed under oath. Any questions or issues which arose during *voir dire* as a result of the questionnaire were preserved for the record as part of the *voir dire* transcription. There was no request by trial counsel that questionnaires be preserved and apparently there was no objection. This issue is waived and we find no plain error. Thus, we find that the record was adequately preserved for the purposes of mandatory sentence review. This proposition of error must fail.

### FIRST STAGE ISSUES

¶ 33 In his fifth proposition of error, Appellant urges that his confession to Teddy Graham should not have been admitted because there was no corroborating independent evidence as required by *Fontenot v. State*, 881 P.2d at 77–81. We do not agree. The State presented eighteen (18) other witnesses who tie Appellant to the crime. Six (6) of the State's witnesses either saw Appellant commit the crime, or were told by Appellant that he committed the crime. One of the corrections officers observed Appellant fleeing from the building where the crime took place. The forensics lab identified blood on Appellant's shirt as that of the victim. In his confession to Teddy Graham, Appellant stated that he stabbed the victim in the leg. The medical examiner confirmed that the victim was stabbed in the leg. In light of the foregoing independent corroborating evidence, Appellant's fifth proposition of error must fail.

¶ 34 Appellant contends in proposition six that the trial court erred in admitting inadmissible hearsay evidence. At issue are statements made by Michael Hendricks, John Crosson, and James Murphy. However, Appellant failed to preserve this issue for review on appeal by failing to object to the statements at trial. *Wilson v. State*, 554 P.2d 806, 809 (Okl.Cr.1976). This proposition is denied.

¶ 35 In proposition seven, Appellant argues that his First and Fourteenth Amendment rights were violated by the State's introduction of other crimes evidence. However, we find that the State gave proper notice as required by *Burks v. State*, 594 P.2d 771 (Okl.Cr.1979), *overruled on other grounds, Jones v. State*, 772 P.2d 922 (Okl. Cr.1989). Thus, Appellant was adequately apprised that the State intended to introduce evidence of other crimes. Further, Appellant failed to object when this evidence was introduced at trial. Failure to object to the introduction of other crimes evidence waives the error on appeal. *Thompson v. State*, 705 P.2d 188, 191 (Okl.Cr.1985); *Brogie v. State*, 695 P.2d 538, 543 (Okl.Cr.1985). Finding no plain error, this assignment is denied.

¶ 36 In his eighth proposition, Appellant asserts that the State's introduction of evidence that Appellant belonged to a white supremacist group violated his First and Fourteenth Amendment rights. Appellant urges that the fact that Appellant was a member of a white supremacist group was irrelevant and prejudicial. Appellant relies on *Dawson v. Delaware*, 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992), to support his contention. In *Dawson* the United States Supreme Court reversed a conviction when evidence of the defendant's membership in a white supremacist group was introduced during the second stage of a proceeding. *Dawson* is distinguishable from the case at bar in that its holding applies to introduction of evidence, during the *second stage*, where the evidence was irrelevant as to aggravation or mitigation. In this case, the evidence was relevant to character issues

and to establish a plan for the crime in the first stage of the proceeding. This proposition of error must fail. *Robison v. State*, 677 P.2d 1080, 1085–86 (Okl.Cr.), *cert. denied*, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984). If the admitted evidence was error (which we do not find) it would be harmless at best due to the overwhelming evidence of guilt.

¶ 37 In his ninth proposition, Appellant challenges the admissibility of the DNA evidence. First, he claims the Roche Laboratory reports were inadmissible because they did not qualify as business records that could be authenticated by a records custodian. We note that defendant failed to object to the admission of the reports on this ground. His objection at trial was based on chain of custody and the necessity of the technicians who performed the test to testify. Thus, he has waived appellate review of a claim that the reports were improperly admitted under the business records exception to the hearsay rule. *Reid v. State*, 478 P.2d 988, 999 (Okl.Cr.1970); 12 O.S.1991 § 2803(6); *Middaugh v. State*, 767 P.2d 432, 435–436 (Okl.Cr.1988).

¶ 38 Second, Appellant claims the DNA evidence was inadmissible because the PCR method of DNA testing is a novel scientific method that has not yet been approved for use in Oklahoma courts. Appellant is correct in asserting that our holding in *Taylor v. State*, 889 P.2d 319 (Okl.Cr.1995), did not specifically approve the polymerase chain reaction (PCR) test. In *Taylor*, this Court adopted the holding in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), for admission of "novel" scientific evidence. *Taylor*, 889 P.2d at 328–29.

¶ 39 Under *Daubert*, several factors are to be considered to determine if new scientific evidence is sufficiently reliable to be admissible. Included are: 1) whether the theory or technique has been subjected to peer review; 2) the known or potential rate of error; 3) whether the methodology has been generally accepted in its field; and 4) whether the scientific methodology has been and can be tested. In determining whether the trial judge properly admitted the evidence, we may consider not only the expert evidence of record, but also judicial opinions in other jurisdictions, as well as pertinent legal and scientific commentaries. The factors are designed to ensure that the expert's testimony rests on a reliable foundation and is relevant to the task at hand. *Daubert*, 113 S.Ct. at 2798–99, 125 L.Ed.2d at 485.

¶ 40 In this case, the trial court conducted a *Daubert* hearing, where Dr. Eisenberg explained the methods utilized by Roche to make its analysis. It is clear that the methods used by Roche can be and have been tested. In addition, Dr. Eisenberg addressed the proficiency testing to which Roche was submitted. It is also clear that PCR analysis has been subject to peer review. Dr. Eisenberg also introduced evidence of the rate of error as well as evidence concerning the laboratory's proficiency testing. Finally, a number of other jurisdictions have accepted PCR analysis as having been generally accepted by the scientific community.[1] The trial court concluded that the PCR method satisfies the requirements of *Daubert* and *Taylor*. We agree. Thus, the DNA evidence was properly admitted against Appellant.

¶ 41 Third, Appellant argues that the prejudicial effect of statistical probabilities evidence introduced through Dr. Eisenberg outweighed its probative value. This

1. Alabama, *Seritt v. State*, 647 So.2d 1 (Ala.Crim. App.1994) (DQ Alpha test generally accepted by the scientific community and found to be reliable); Colorado, *People v. Groves*, 854 P.2d 1310 (Colo.Ct.App.1992); New Jersey, *State v. Williams*, 252 N.J.Super. 369, 599 A.2d 960 (1991) (PCR accepted by scientific community and sufficiently reliable to be admissible in murder prosecution); Oregon, *State v. Lyons*, 124 Or.App. 598, 863 P.2d 1303 (1993) (PCR generally accepted by the scientific community, appropriate for forensic use); Texas, *Clarke v. State*, 839 S.W.2d 92 (Tex.Crim.App.1992), *cert. denied*, 507 U.S. 996, 113 S.Ct. 1611, 123 L.Ed.2d 172 (1993) (PCR test admissible under relevancy standard consistent with *Frye*); and Virginia, *Spencer v. Commonwealth*, 240 Va. 78, 393 S.E.2d 609 (1990), *cert. denied*, 498 U.S. 908, 111 S.Ct. 281, 112 L.Ed.2d 235 (1990) (Although *Frye* test not followed, PCR DNA technique scientifically reliable and admissible.

Court specifically addressed this issue and determined that admission of statistical probability evidence was necessary to the admission of DNA evidence. *Taylor*, 889 P.2d at 334–38.

■ ¶ 42 Fourth, Appellant urges that irrelevant and prejudicial physical evidence that was never connected to him was improperly admitted to prove the murder charge. Specifically, he contends the shirt found underneath his mattress was not linked to him by direct evidence. Officer Haynes and Sgt. Maddux searched Appellant's cell and found a shirt with the victim's blood on it under Appellant's mattress. Thus, a reasonable inference can be drawn that the shirt belonged to Appellant. Having found none of the arguments of this proposition to be of merit, this proposition is denied.

■ ¶ 43 In his tenth proposition of error, Appellant urges that the evidence was insufficient to support the jury's verdict. We do not agree. Not only was there a confession in evidence, but several individuals placed Appellant at the scene of the crime. Appellant was seen stabbing the victim, and a shirt with the victim's blood on it was found in Appellant's bunk. This proposition of error is without merit.

■ ¶ 44 In his eleventh proposition, Appellant cites four instances where he claims the trial court failed to properly instruct the jury. These include:

A. failure to give a limiting instruction on other crimes evidence;

B. failure to instruct on uncorroborated confession;

C. failure to instruct that David Crawford was an accomplice as a matter of law and that Appellant could not be convicted on Crawford's uncorroborated testimony; and

D. failure to give a cautionary instruction on informant testimony.

■ ¶ 45 We have reviewed the instances in question and find that Appellant neither requested nor offered any instructions. Thus, he has waived all but plain error. *See Parkhill v. State*, 561 P.2d 1386 (Okl.Cr.1977) (A) and (B); *Holt v. State*, 774 P.2d 476 (Okl.Cr.1989) (A); *Shelton v. State*, 793 P.2d 866 (Okl.Cr.1990) (B); *Bryson v. State*, 876 P.2d 240, 256 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995) (holding error, but harmless if sufficient corroborating evidence was presented at trial; in this case, in view of the overwhelming evidence of guilt, the error was harmless beyond a reasonable doubt) (C); *Wilson v. State*, 756 P.2d 1240, 1244 (Okl.Cr. 1988) (holding that failure to give a cautionary instruction on informant testimony in the absence of a request was neither mandatory nor reversible error) (D). This proposition is denied.

## SECOND STAGE ISSUES

■ ¶ 46 In his twelfth proposition of error, Appellant complains about the use of victim impact evidence at his sentencing. Specifically, he complains about the victim's wife's opinion that the death penalty was appropriate. In *Ledbetter v. State*, 933 P.2d 880 (Okl.Cr.1997), this Court addressed the appropriateness of an opinion as to the appropriate punishment, saying "[a]ny opinion as to the recommended sentence should be given as a straight-forward, concise response to a question asking what the recommendation is; or a short statement of recommendation in a written statement, without amplification." Here, there was nothing improper in the victim's wife straight-forward, concise statement; further, a jury expects such a statement from the victim's family. Appellant's argument that the admission of this statement was violative of the Eighth Amendment was presented and rejected in *Hain v. State*, 919 P.2d 1130, 1144 (Okl.Cr.), *cert. denied*, —— U.S. ——, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996).

■ ¶ 47 Appellant further argues that his Eighth and Fourteenth Amendment rights were violated because the victim impact evidence was presented prior to the evidence on the aggravating circumstances. He relies on this Court's language in *Cargle v. State*, 909 P.2d 806, 828 (Okl.Cr.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996), where we directed that victim impact evidence should not be admitted until the trial court determines evidence

of one or more aggravating circumstances is already present in the record. The aforesaid pronouncement was not intended to dictate the order of presentation of evidence during the second stage, but to insure that the trial court was satisfied there was evidence of one or more aggravating circumstances before allowing victim impact evidence to be introduced during second stage. We intended such information to be ascertained in an in-camera hearing held to determine the admissibility of proffered victim impact evidence. In this case, an in-camera hearing was held and the trial court determined there was sufficient evidence of four aggravating circumstances.

¶ 48 Further, Appellant asserts the jury was not instructed on the use of victim impact evidence or its place in the sentencing decision. A specific instruction on victim impact evidence as prescribed by *Cargle*, 909 P.2d at 828, was not given in this case. However, Appellant's case was tried before the *Cargle* decision. In *Cargle*, as in the present case, a specific instruction on victim impact evidence was not given, nor was it found that the absence of such instruction rendered the defendant's sentence unreliable. As in *Cargle*, we find the absence of such instruction does not require reversal. Considering the second stage instructions as a whole, we do not find the admission of the victim impact evidence altered or negated said instructions. Appellant has failed to demonstrate that the jury's sentencing discretion was not properly channeled by the instructions given to them or that the victim impact evidence influenced the jury to impose a sentence not supported by the evidence. *See Charm v. State*, 924 P.2d 754, 766 (Okl.Cr.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997). This proposition of error is denied.

¶ 49 In his thirteenth proposition, Appellant argues that the evidence was insufficient to support the aggravating circumstance that Appellant knowingly created a great risk of death to more than one person. Appellant relies on *Valdez v. State*, 900 P.2d 363, 382–83 (Okl.Cr.), *cert. denied*, 516. U.S. 967, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995), in which this Court held that where no one

beside the murder victim is injured, it must be shown that the perpetrator at least seriously considered killing people other than the victim. However, in *Valdez*, the individual who allegedly was at "great risk of death" was an acquaintance of the defendant's. In *Valdez*, although the defendant threatened to kill this individual if he told or did not help him dispose of the body, the individual knew that the defendant's anger was not directed at him, but at the victim.

¶ 50 In the instant case, Appellant, through his accomplice, Chatham, created a "great risk of death" to Murphy. The evidence showed that Chatham and Appellant entered Murphy's cell. Chatham handed Appellant a knife in Murphy's presence. Appellant then told Chatham to make sure Murphy stayed in the cell. As Appellant went down the corridor to kill the victim, Chatham told Murphy to sit down. He then displayed a knife and told Murphy to mind his own business. In *Ross v. State*, 717 P.2d 117, 123 (Okl.Cr.1986), *affirmed*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), this Court held that the "great risk of death" aggravator applies even where only one person is killed or wounded. In *Ross*, this aggravator was found to exist where the defendant threatened to shoot a motel clerk if she did not cooperate. We find the situation analogous to the present case. Co-defendant Chatham, who was told by Appellant to keep Murphy in his cell, threatened Murphy with a knife if he did not mind his own business. This proposition is without merit.

¶ 51 In his fourteenth proposition of error, Appellant claims his Eighth and Fourteenth Amendment rights were violated because the jury's finding of the aggravating circumstances, "murder during imprisonment," "prior violent felony," and "continuing threat" were duplicitous and cumulative. Appellant recognizes this Court has consistently rejected his contention and held that the same evidence may support the finding of more than one aggravating circumstance. *See Woodruff v. State*, 846 P.2d 1124, 1146 (Okl.Cr.), *cert. denied*, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993). While he has presented argument and authority from other states where such consideration is forbid-

den by statute, we are not persuaded to abandon our previous position. Moreover, because each aggravator covers a different aspect of Appellant's criminal history, there is no overlapping of the aggravating circumstances. *See Green v. State,* 713 P.2d 1032, 1039–1041 (Okl.Cr.1985), *overruled in part on other grounds, Brewer v. State,* 718 P.2d 354, 365–66 (Okl.Cr.), *cert. denied,* 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 169 (1986).

¶ 52  In his fifteenth proposition of error, Appellant contends his Eighth and Fourteenth Amendment rights to have the jury consider mitigating evidence was violated when the Prosecutor argued in closing that the evidence could and should be considered in aggravation. The mitigating evidence referred to is that offered by Dr. Phillip Murphy concerning Appellant's mental disability. Dr. Murphy testified on cross-examination that he was not surprised Appellant had committed another murder in light of his psychological profile, and that Appellant would be a continuing threat in whatever society he was placed. Dr. Murphy also testified that the particular disorder the Appellant suffered (paranoid schizophrenia combined with right brain hemisphere dysfunction) made it more likely that Appellant would commit murder than a person suffering from paranoid schizophrenia alone. According to Dr. Murphy, the brain dysfunction is what makes Appellant more likely to kill than other paranoid schizophrenics. Dr. Murphy also found that as a result of his schizophrenia, Appellant had a delusion of himself as avenger. Specifically, Appellant views himself as an avenger of children who are sexually abused.

■ ¶ 53  Appellant objects to several statements made by the Prosecutor during his closing with regard to Dr. Murphy's testimony. Of these statements, we find only one to be an inaccurate comment on the evidence:

> And he also testified that, you know, there are a lot of people in the world that's paranoid schizophrenics and they don't commit murder. And he said that there was no reason why he should, other than he was a paranoid schizophrenic, and that he was an avenging personality, the best I remember.

This comment is incorrect since Dr. Murphy clearly distinguished between Appellant and other paranoid schizophrenics, in that what made him more likely to commit murder was his right brain dysfunction. However, since the Prosecutor qualified his statement with "the best I remember," we find the misstatement was not intentional. Additionally, the jury heard the testimony of Dr. Murphy and had access to his testimony if they felt they needed to review it during deliberation. Thus, we find the Prosecutor's misstatement to be harmless.

■ ¶ 54  Appellant also objects to a question asked of Dr. Murphy on cross-examination. The Prosecutor asked Dr. Murphy, "[a]nd is it your testimony that, given what you know about [Appellant], that he's likely to go off like that at any time, to kill anybody at any time?" To which Dr. Murphy replied, "No, I mean, it would have to meet certain criteria." Appellant asserts that this question brought up a fact not in evidence and could not be argued. Appellant relies on *Davis v. State,* 413 P.2d 920, 925 (Okl.Cr.1966), in which this Court held that "[I]t is improper for the county attorney to . . . state facts not proved by evidence or otherwise given before the jury, and which amounts to his own opinion." (citations omitted). However, in this case, the Prosecutor asked a question to which he got a negative answer. This question did not amount to a statement of facts not proved or evidence not given. In fact, the answer given by Dr. Murphy was beneficial to Appellant.

■ ¶ 55  Finally, Appellant urges that the Prosecutor invaded the province of the jury when he stated that Appellant's mental impairment was "not even mitigation at all." However, we find this statement within the context of which it was made to be a fair comment on the evidence. This proposition is denied.

■ ¶ 56  Appellant argues in his sixteenth proposition of error, that his Fourteenth Amendment right to a fair opportunity to rebut the State's evidence in support of the death penalty was violated when the trial court refused to allow him to present the testimony of Jack Cowley, Warden, Okla-

homa State Reformatory. The proffer of proof reveals that Warden Cowley would testify that the prison system would protect other inmates from him if he were sentenced to life imprisonment without parole since he would be housed under maximum security status. Further, that he would be in lock-up twenty-three (23) hours a day and never see outside the concrete walls of the unit. We agree with the State that Appellant misperceives the "continuing threat" aggravating circumstance. This aggravator seeks to determine whether the character of the defendant is such that there is a "need for protection of society from the defendant's probable future conduct." *Pickens v. State*, 850 P.2d 328, 336 (Okl.Cr.1993), *cert. denied*, 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994). Whether society can provide a measure of protection for itself against him is not the issue. This proposition is without merit.

¶ 57 In his seventeenth proposition of error, Appellant asks this Court to vacate his death sentence and remand for resentencing because two of the aggravating circumstances ["continuing threat" and "great risk of death to more than one person"] are unconstitutionally vague. This Court has repeatedly rejected arguments on the unconstitutionality of the "continuing threat" aggravating circumstance and we are not persuaded to alter our prior position. *See Cooper v. State*, 889 P.2d 293, 315 (Okl.Cr. 1995); *Malone v. State*, 876 P.2d 707, 715-16 (Okl.Cr.1994), and cases cited therein; *Walker v. State*, 887 P.2d 301, 320 (Okl.Cr. 1994), *cert. denied*, 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995). Likewise, we have reviewed and rejected arguments on the unconstitutionality of knowingly creating a great risk of death to more than one person. *See Malone*, 876 P.2d at 716; *Cartwright v. State*, 695 P.2d 548 (Okl.Cr.1985), *cert. denied*, 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985); *Cartwright v. Maynard*, 802 F.2d 1203 (10th Cir.1986), *on rehearing*, 822 F.2d 1477 (10th Cir.1987), *affirmed*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Accordingly, this proposition is denied.

¶ 58 In his eighteenth proposition of error, Appellant contends that the accu-mulation of errors in this case so infected the trial and sentencing proceedings with unfairness that he was denied due process of law and a reliable sentencing proceeding. Reversal is required based upon a cumulative error argument only if the cumulative effect of all the errors committed during the course of the first stage of trial was to deny the defendant a fair trial. *Bechtel v. State*, 738 P.2d 559, 561 (Okl.Cr.1987). As no error was found, this proposition is denied.

¶ 59 In his nineteenth proposition of error, Appellant urges that he was denied his Sixth Amendment right to counsel when defense counsel conceded guilt during first stage closing argument, resulting in a total breakdown of the adversary process and a presumption of prejudice. Defense counsel's entire closing argument is set out below:

> Ladies and gentlemen, I too would like to thank you very much for being here. I want to say what I said earlier this week when we talked—by the way, it's nice to talk to you again after a few days, we can't talk in between times. But I would like to sincerely say that I'm very sorry that you were pulled away from your everyday life and thrust into such a serious situation.

> What we have here, ladies and gentlemen is the evidence, the instructions and the argument of the District Attorney, and that's how far we've gotten.

> If you understand the DNA stuff and think it's reliable—it's so far over my head I don't know what I think about it. But if you understand it, and think it's reliable, and if you believe in it, and if you understand the testimony and believe the testimony—I should say, if you believe the testimony of the inmates, then I don't think you're going to have a reasonable doubt.

> If you do not understand the DNA, don't know if it's reliable, and if you do not believe the inmates, then I would say you certainly have cause to say I have a reasonable doubt and, at that time, would vote not guilty.

> We talked earlier this week about you all using your minds, and your hearts, and your conscience in making such an impor-

tant decision as you're called upon to make here. I would simply like to ask you to do that, and ask you to make decisions that you can feel secure with and feel satisfied with.

I've always said, and will continue to say, that as long as a person makes a decision that he truly feels in his heart is right, then he will not ever have any regrets.

Thanks again.

¶ 60 We do not agree that defense counsel's closing argument amounted to a concession of guilt. Indeed trial counsel's decision not to make an extended argument may well have been a strategic one. This Court will not second guess trial strategy. *Cargle,* 909 P.2d at 832. Here, counsel downplayed the DNA evidence as too complicated and not easily understood, even by him. Trial counsel then pointed out that the only other evidence was that offered by convicted felons, whose credibility was left to the jury. In light of the overwhelming evidence against Appellant, trial counsel may have decided not to overstate his case lest he lose credibility for the second stage where he would need it the most. A fine trial lawyer may well decide that guilt could not be doubted and save the best for saving his life. We do not find counsel's performance deficient under the circumstances.

### INEFFECTIVE ASSISTANCE
### OF COUNSEL CLAIMS

¶ 61 In his twentieth and final proposition of error, Appellant raises claims of ineffective assistance of counsel as follows:

A. Failure to challenge jurors for cause when they stated they would automatically impose the death penalty conviction;

B. Failure to suppress alleged confession for lack of corroboration and request a jury instruction on corroboration;

C. Failure to request cautionary instructions on other crimes evidence and testimony by accomplice David Crawford and informant Teddy Graham;

D. Failure to request a Harjo hearing on admissibility of co-conspirator statements by David Chatham and object to hearsay evidence introduced by Hendricks and Crosson; and

E. Failure to move to suppress eyewitness identifications and ask for a pretrial hearing on their unreliability outside the hearing of the jury and to object to their admission at trial.

¶ 62 The merits of the claims set forth in A, B, C, and D are discussed in propositions three, five, eleven, and six, respectively. Addressing subproposition E, there is nothing in the record to raise any issue of an unconstitutional extra-judicial identification procedure being used. Thus, we find no merit. Having found no error in any of these claims, we find Appellant was not deprived of his constitutional right to effective assistance of trial counsel.

¶ 63 In subproposition F, Appellant, in accordance with Rule 3.11 of the Rules of the Oklahoma Court of Criminal Appeals, as amended effective November 1, 1995, filed a motion for an evidentiary hearing on Sixth Amendment claims unsupported by matters outside the trial record. Specifically, Appellant claims defense counsel failed to properly utilize available evidence in mitigation and to raise a competency issue and present an insanity defense. On April 29, 1997, this Court entered an Order remanding this case to the District Court of Greer County for an evidentiary hearing to investigate Appellant's allegations of ineffective assistance of counsel. On August 13, 1997, the Honorable Charles L. Goodwin, District Judge, issued his Findings of Fact and Conclusions of Law. [Appellant filed his Brief After Remended Evidentiary Hearing on August 28, 1997.] While the trial court found that "[t]rial counsel did not spend a great deal of time and effort attempting to develop a "sanity" defense or an "under the influence of drugs" defense even though there was some evidence to support those defenses, the trial court concluded that trial counsel was not ineffective, reasoning, in part:

Trial counsel knew of the prior rulings [2] against his client, had no reason to suspect

---

2. The trial court found that "Dr. Murphy had

with the aid of an O.I.D.S. investigator developed

his client's lack of competence due to his demeanor and ability to converse and made a conscious decision to concentrate his efforts on *voir dire* and closing arguments in light of the overwhelming testimony against his client.

This Court will give the trial court's findings strong deference if supported by the record, but we shall determine the ultimate issue whether trial counsel was ineffective. Rule 3.11(B)(3)(b)(iv), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (1997).

¶ 64 To prevail on a claim of ineffective assistance of counsel, Appellant must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance by showing: [1] that trial counsel's performance was deficient; and [2] that he was prejudiced by the deficient performance. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *See also Spears v. State,* 900 P.2d 431, 445 (Okl.Cr.), *cert. denied,* 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527 (1995). One alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. *See also Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). This Court need not determine whether trial counsel's performance was deficient if Appellant cannot show he was prejudiced by trial counsel's failure to determine his competency to stand trial, to present an insanity or other mental state defense, such as voluntary intoxication, and to introduce the testimony of Dr. Sally Church and Dr. Richard Rettig as mitigation.

¶ 65 "The fact that a defense attorney could have investigated an issue more thoroughly does not, in and of itself, constitute ineffective assistance." *Fontenot,* 881 P.2d at 86. We have reviewed the record of the evidentiary hearing very carefully and find as follows to the issues presented:

### 1. Failure to determine competency to stand trial

¶ 66 Defense counsel testified that he conducted no investigation into facts related to Appellant's competency. Defense counsel was aware that Appellant was found competent to stand trial on two counts of murder in Lincoln County more than two (2) years prior to trial in the instant case. Defense counsel observed nothing in Appellant's behavior during their meetings that would lead him to believe that Appellant could not adequately respond to questions. Defense counsel found Appellant to be of average intelligence and capable of understanding and answering information and questions, respectively, presented to him. Defense counsel related that Appellant aided in his trial by, among other things, assisting in the selection of the jury. Based on the aforesaid, we find defense counsel's belief that Appellant was competent was reasonable.

### 2. Failure to present an insanity or voluntary intoxication defense

¶ 67 Appellant contends defense counsel failed to conduct an investigation into facts which would have revealed Appellant's mental condition of paranoid schizophrenic with organic brain damage with a history of auditory and command hallucinations. Defense counsel testified that based on the evidence presented at the Preliminary Hearing and his interviews of witnesses at Granite, he believed the State's evidence of guilt was overwhelming and that there was little he could do to defend against the murder charge. Thus, he made the strategic decision to concentrate on *voir dire* and second stage. As the facts reveal, Appellant's participation in the murder was planned and calculated and not the result of any auditory or command hallucination. Thus, we find defense counsel's strategy to be reasonable under the circumstances.

¶ 68 Again, appellant contends defense counsel failed to conduct an investiga-

an extensive file on the Defendant's sanity. That defense did not persuade a jury in Lincoln County a short time prior to the case at Bar [sic] and had been determined adversely to that position when Judge Craig accepted Defendant's pleas of *nolo contendere* some four months prior to the brutal murder of John Brigden."

tion into facts which would have revealed that Appellant tested positive for marijuana when a urine sample taken from him at 5:45 a.m. on the morning after the murder. Further, that three months prior to the murder, Psychological Services tested Appellant and recommended "further psychological evaluation," "support therapy," and "substance abuse treatment." Again, based on the facts as presented at the Preliminary Hearing, there was no evidence sufficient to raise a reasonable doubt concerning Appellant's ability to form the specific intent. *See Crawford v. State*, 840 P.2d 627, 638 (Okl.Cr.1992). Thus, we find defense counsel's strategy to be reasonable.

### 3. Failure to introduce evidence in mitigation

■ ¶ 69 Appellant contends defense counsel failed to call any of Appellant's family members to testify as to his personal background and family history of abusive alcoholic behavior by his father and alcohol abuse by Appellant on a daily basis since the age of seven (7) years. Defense counsel relied on the expertise of Dr. Murphy. However, Appellant contends that because Dr. Murphy is a clinical, forensic psychologist who focuses on the psychology of the individual, performs tests, and arrives at diagnoses, he was not qualified to explain Appellant's life history from the theoretical perspective of specialists in the areas of drug and alcohol abuse, additive families, learning disorders, social psychology, and prison cultures. Appellant claims that evidence of his life history and the external constraints that determined his behavior inside and outside of prison would have mitigated against a death sentence and should have been presented to his jury. Appellant attempted to present this evidence through the testimony of Dr. Sally Church[3] and Dr. Richard Rettig.[4] Appellate counsel called Dr. Church and made an offer of proof. The trial court refused to permit Dr. Church to testify, ruling that "[h]er testimony was not in existence at the time of trial and would not have been admitted if offered due to failure of qualifications as an expert in areas that affect Defendant." The trial court's refusal to allow Dr. Church to testify may have been erroneous. *See Salazar v. State*, 919 P.2d 1120, 1129 (Okl.Cr.1996). However, we have reviewed the offer of proof and Dr. Church's Affidavit submitted on appeal and find that more detailed psychological evidence would not have affected the sentence rendered. We so find because the State's case in aggravation was strong and because defense counsel presented a great deal of psychological evidence in mitigation.

¶ 70 The trial court also refused to allow the reopening of the evidentiary hearing for the purpose of taking testimony from Dr. Rettig who suffered a heart attack and was in the Emergency Room at Mercy Hospital. The trial court reasoned that Dr. Rettig would say "the similar thing that the Court ruled against Jack Calley [sic] testifying to." See Proposition Sixteen, *supra*. Appellant made an offer of proof that Dr. Rettig has been qualified to testify in capital cases as a specialist in prison subcultures and that Dr. Rettig was his only hope in persuading the jury that he could be safely incarcerated. While the record reveals that Appellant filed a brief offer of proof with his motion, the motion was not submitted to this Court as part of the record of the evidentiary hearing. Nonetheless, based on the offer of proof made at the evidentiary hearing, we find the evidence to be of the same ilk as that which we rejected in Appellant's sixteenth proposition of error. Accordingly, Appellant's claim of ineffective assistance of counsel for failure to investigate and otherwise present this evidence is without merit.

¶ 71 Having thoroughly reviewed the issues presented at the evidentiary hearing, we deny Appellant's claim of ineffective assistance of counsel. According, this proposition of error is denied.

---

**3.** Dr. Church is a licensed Professional Counselor in marriage and family therapy and a nationally certified school Psychologist, holding a Ph.D. in Educational Psychology and has been in private practice for twenty (20) years. In her career, Dr. Church has performed at least 85 forensic psychodiagnostic child and adult crime assessments, and has testified in criminal cases on at least 50 occasions.

**4.** Dr. Rettig is a Professor of sociology and criminal justice at Central State University, Edmond, Oklahoma, with a specialty in prison subcultures.

**MANDATORY SENTENCE REVIEW**

¶ 72 Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S. 1991, § 701.12. We shall first determine whether the evidence was sufficient to support the imposition of the death penalty.

¶ 73 The jury found the following aggravators:

1. The defendant was previously convicted of a felony involving the use or threat of violence to the person;
2. The defendant knowingly created a great risk of death to more than one person;
3. The murder was committed by a person while serving a sentence of imprisonment on conviction of a felony; and
4. The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

In reviewing the evidence presented by the State, we find that Appellant was previously convicted of a felony involving the use or threat of violence to the person in his prior commission of two murders by stabbing his victims. We find that Appellant knowingly created a great risk of death to more than one person by ordering David Chatham, who was armed with a knife, to make sure James Murphy stayed in his cell. We find that the murder was committed by Appellant while serving a sentence of imprisonment on conviction of a felony as Appellant, at the time he committed the crime, was serving a sentence for a double-murder. We further find that the callous nature of the crime and Appellant's blatant disregard for the importance of human life render him a continuing threat to society. The evidence substantially supports the finding of the four aggravators.

¶ 74 Besides testimony from Dr. Philip Murphy, psychologist, regarding Appellant's mental incapacity, the trial court found the following minimum mitigating circumstances [as provided by law] which were submitted to the jury:

1. The murder was committed while Appellant was under the influence of extreme mental or emotional disturbance.
2. At the time of the murder, the capacity of Appellant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease.

¶ 75 Upon carefully considering and reviewing the evidence which supports the aggravating circumstances, as well as the evidence which may be considered mitigating, this Court finds the sentence of death was factually substantiated and appropriate. Furthermore, we find that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor. Finding no error warranting reversal or modification, the Judgment and Sentence is **AFFIRMED.**

**DECISION**

The Judgment and Sentence of the trial court is **AFFIRMED.**

STRUBHAR, V.P.J., and LUMPKIN, J., concur.

CHAPEL, P.J., and LANE, J., concur in results.

LANE, Judge, concur in results:

¶ 1 Even though I disagree with the majority in some respects, I still concur in the results reached.

¶ 2 In its treatment of Proposition Five, Appellant's contention that the statement he made to a fellow inmate was not corroborated, the majority ignores the fact that the main thrust of Appellant's argument goes to the fact there was no corroboration for a portion of the statement. He claims that the State contended from the inmate's account of the statement that the Appellant stated the murder was committed for the purpose of robbing the victim of his watch and ring. He asserts that the statement was not admissible, because there was no evidence that there was a robbery or that Bridgen even had a watch or a ring. I agree with the majority that there was plenty of evidence to general-

ly corroborate the statement and would point out that it is not necessary to corroborate all parts of a statement. *See, Fontenot v. State,* 1994 OK CR 42, ¶ 30, 881 P.2d 69, 79.

¶ 3 I also disagree with the majority when it finds that Appellant's membership in a white supremacist group is admissible as evidence in the first stage of the trial. The majority would admit it as relevant to issues of *character* and to establish a motive for the crime in the first stage of the proceeding. I would remind the majority that issues of character are not admissible in the guilt/innocence stage of a trial until a defendant puts his character in issue. 12 O.S.1991 § 2404. Appellant had not done this at the time the evidence was admitted.[1] In addition, I fail to see how in this case membership in this organization is relevant to establish motive.[2] It is inadmissible, but, in the light of the overwhelming evidence of guilt I would find its admission harmless.

¶ 4 I next disagree with the majority in its approval of the testimony of the victim's wife as to her opinion of the appropriate punishment. It is my belief that because opinion as to punishment is only authorized by 22 O.S.Supp.1997 § 984 it is not admissible during the second stage of the trial. *See* my vote in *Ledbetter v. State,* 1997 OK CR 5, ¶¶ 1–6, 933 P.2d 880 (Lane, J. concur in results). However, I recognize that because of our decision in *Ledbetter* and other cases the doctrine of stare decisis applies.

¶ 5 Finally, I would not affirm the jury finding of great risk of death to more than one person. The majority relies on *Ross v. State,* 1986 OK CR 49, 717 P.2d 117. I think our fact situation is closer to *Valdez v. State,* 1995 OK CR 18, 900 P.2d 363, *cert. denied* 516 U.S. 967, 116 S.Ct. 425, 133 L.Ed.2d 341 where we held that when the defendant threatened another telling him that he would kill him if he did not cooperate, not to interfere, and to help clean up the blood after the murder was not sufficient to justify this ag-

gravating circumstance. All of Valdez's anger was directed at the person killed and not the person who claimed to have been threatened. The same situation is present here. All of Appellant's anger was directed at Brigden and not toward Murphy. The threats to Murphy were only for the purpose of preventing him from interfering with the murder, and he was never in immediate danger of being killed as long as he stayed in his cell.

¶ 6 However, this does not mean that I would reverse the death sentence. When I discount this aggravating circumstance and reweigh the remaining aggravators as authorized by *Castro v. State,* 1991 OK CR 79, ¶ 5, 814 P.2d 158, *cert. denied,* 502 U.S. 1063, 112 S.Ct. 947, 117 L.Ed.2d 116. I still conclude that beyond a reasonable doubt the jury would have returned a death sentence.

▮

---

1. The majority relies upon *Robison v. State,* 1984 OK CR 21, 677 P.2d 1080, *cert. denied* 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 to justify a finding the evidence is admissible. In *Robison* there was testimony that the Appellant committed a robbery to obtain funds to build an amphetamine laboratory. This does establish motive. In our current case there is no connection in the

record between Appellant's membership and the murder. 

2. To be relevant the evidence must have a tendency to make more or less probable a material fact in issue. *President v. State,* 1979 OK CR 114, 602 P.2d 222.