1999 OK CR 21

Billy Don **ALVERSON**, Appellant,

v.

**STATE of Oklahoma, Appellee.**

No. F–97–1018.

Court of Criminal Appeals of Oklahoma.

May 6, 1999.

Rehearing Denied June 8, 1999.

Jim Fransien, Tulsa, for defendant at trial.

William Lafortune, District Attorney, Brett Swab, Assistant District Attorney, Tulsa, for the State at trial.

Stuart Southerland, Tulsa, for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer B. Miller, Assistant Attorney General, Oklahoma City, for appellee on appeal.

## *OPINION*

CHAPEL, Judge:

¶1 Appellant, Billy Don Alverson, was charged conjointly with three codefendants [1] with the crimes of first degree malice murder and, in the alternative, first degree felony murder (Count I) in violation of 21 O.S.1991, § 701.7(A) & (B) and robbery with a dangerous weapon (Count II) in violation of 21 O.S.1991, § 801 in the District Court of Tulsa County, Case No. CF–95–1024. The State filed a bill of particulars alleging three aggravating circumstances. A jury trial was held

---

1. The codefendants were Michael Lee Wilson, Darwin Demond Brown and Richard Harjo. Wilson and Brown were tried conjointly and sentenced to death. Their appeals were affirmed in *Wilson v. State*, 1998 OK CR 73, 983 P.2d 448 and *Brown v. State*, 1998 OK CR 77, 983 P.2d 474. Appellant Alverson was tried conjointly with Harjo. Harjo was the only codefendant to receive life without the possibility of parole. Harjo's appeal was affirmed in part and reversed in part by unpublished opinion in *Harjo v. State*, F–97–1054 (not for publication).

before the Honorable E.R. "Ned" Turnbull, District Judge. The jury found Alverson guilty of first degree murder and robbery with a dangerous weapon. After the punishment stage, the jury found the existence of two aggravating circumstances: (1) that the murder was especially heinous, atrocious or cruel; and (2) that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. 21 O.S.1991, § 701.12(4) & (5).

## I. FACTS

¶ 2    Alverson's co-defendant, Michael Wilson, worked at the QuikTrip convenience store located at 215 N. Garnett Road in Tulsa, Oklahoma. Wilson, Alverson, and two of their friends, Richard Harjo and Darwin Brown, went to the QuikTrip during the early morning hours of February 26, 1995. They chatted with Richard Yost, the night clerk, until the most opportune time arose for them to accost him and force him into the back cooler. They handcuffed him and tied his legs with duct tape. Alverson and Harjo went outside and returned with Harjo carrying a baseball bat.

¶ 3    Yost was found beaten to death in a pool of blood, beer and milk. Part of a broken set of handcuffs was found near his right hip. The medical examiner found a pin from these handcuffs embedded in Yost's skull during the autopsy. Two safes containing over $30,000.00 were stolen, as well as all the money from the cash register and the store's surveillance videotape. All four defendants were arrested later that same day wearing new tennis shoes and carrying wads of cash. The stolen drop safe and the store surveillance videotape, as well as other damaging evidence, was found in a search of Alverson's home. The baseball bat, the victim's bloody QuickTrip jacket, the other cuff from the set of broken handcuffs, and Wilson's Nike jacket which matched the one he wore on the surveillance tape were taken

from Wilson's home. For a more detailed rendition of the facts, see *Wilson v. State*, 1998 OK CR 73, 983 P.2d 448 and *Brown v. State*, 1998 OK CR 77, 983 P.2d 474.

¶ 4    Alverson raises seventeen (17) propositions of error in his appeal.

## II. DUAL JURY ISSUES

¶ 5    Alverson and co-defendant Harjo were tried conjointly, but with separate juries deciding their fate. Alverson complains in his sixth proposition of error that this dual jury procedure is not authorized by law, and that it deprived him of a fair trial. We disagree.

¶ 6    This Court has approved the use of dual juries in codefendant cases.[2] Additionally, we previously ruled in an "Extraordinary Writ" action initiated by Alverson and his codefendants that the use of dual juries in this case was discretionary with the trial judge since the procedure is not prohibited by Oklahoma law.[3] Accordingly, collateral estoppel prevents Alverson from arguing the dual jury procedure in this case was contrary to Oklahoma law.[4] However, we will address Alverson's claims regarding the procedure's effect on his rights.

¶ 7    Alverson bears the burden of showing actual prejudice before relief will be warranted.[5] Alverson first claims the procedure had a chilling effect on cross-examination because the attorneys for the respective defendants had to be careful not to ask questions that were prejudicial to one co-defendant without first having the other co-defendant's jury removed. He claims when this occurred, his jury was left to improperly speculate that evidence against him was about to be presented. Alverson does not cite to any instances showing actual prejudice, but rather hypothesizes that his jury

2.  *Cohee v. State*, 942 P.2d 211, 1997 OK CR 30, Guideline 2, 942 P.2d 211, 213.

3.  *Harjo et al. v. Turnbull*, Order Denying Petitions for Extraordinary Relief, Nos. P 96–1258, P 96–1266, P 96–1278 (Okl.Cr.January 14, 1997) (not for publication).

4.  *Wilson v. State*, 1998 OK CR 73, ¶ 11, 983 P.2d 448, *citing Wilson v. Kane*, 1993 OK 65, n. 23, 852 P.2d 717, 727.

5.  *Wilson*, 1998 OK CR 73 at ¶ 12, 983 P.2d at 456 (citations omitted).

was prejudiced in this way. We are not persuaded.

¶ 8 The trial judge painstakingly instructed Alverson's jury that there would be occasions where evidence would be presented to just one jury and not the other, but they were to decide the case only on the evidence presented to them regarding Alverson. The Court's instructions were designed to alleviate any possible confusion or speculation on the part of the two juries. The record is void of any indication that the juries did not follow the trial court's instructions.

¶ 9 Moreover, Alverson does not cite to any specific instances where the dual jury procedure "chilled" defense counsel's cross-examination of witnesses. There is no indication that his attorney's cross-examination of any witnesses would have been different had the dual jury procedure not been used. Again, Alverson merely hypothesizes in general terms that dual juries tend to chill cross-examination. This is insufficient to show actual prejudice and will not merit relief.

■ ¶ 10 Alverson also claims that the dual jury procedure created a conflict of interest situation because his attorney was ordered not to do anything to prejudice co-defendant Harjo. He asserts this placed his attorney in a position where he had to simultaneously protect the interests of two parties. However, this is not the case. Alverson's attorney was merely instructed not to do anything to prejudice co-defendant Harjo *in the presence of Harjo's jury.* All Alverson's lawyer had to do was ask the court to remove Harjo's jury if he wanted to proceed along lines which were damaging to Harjo. This in no way made him an advocate or a co-counsel for Harjo, and Alverson's reliance on *Holloway v. Arkansas* [6] is entirely misplaced.

■ ¶ 11 Finally, Alverson complains that he was prejudiced by co-defendant Har-

jo's questioning of State's witness Mandy Rumsey. Rumsey had testified that she did not see blood on Harjo, whom she knew from school, the night of the murder. She also testified that she had not paid much attention to Alverson because she did not know him. Harjo's counsel asked Rumsey what color clothing Alverson was wearing that night, and she answered that he was wearing a dark blue jacket. Harjo's counsel then asked her if that was one reason she couldn't tell if he did or didn't have blood on his clothing—because of the dark color.

¶ 12 Alverson's attorney did not object to this question in a timely manner, waiving all but plain error. We disagree that the question put Alverson in a position of having to defend against two prosecutors. It was a question asked solely for clarification and did not elicit any information that Alverson's jury did not already have before it. Accordingly, it did not rise to the level of plain error. Having found none of the arguments in this proposition to be of merit, this proposition is denied.

## III. FIRST STAGE ISSUES

¶ 13 In his first proposition of error, Alverson contends he was under illegal arrest at the time he was removed from Wilson's vehicle, which he was driving without a license, and handcuffed. He claims his subsequent confession was tainted by this illegal arrest and must be suppressed.

■ ¶ 14 Contrary to Alverson's claim, he was not under arrest, but rather under investigative detention when officers removed him from the car and handcuffed him.[7] He was being detained not only so officers could investigate his possible involvement in Yost's murder, but also because they had just caught him driving without a li-

---

6. 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (reversible error to order attorney to represent three different codefendants with conflicting interests where counsel warned a possible conflict of interest will occur because of joint representation).

7. *Brown v. State,* 1998 OK CR 77, ¶ 39–40, 983 P.2d 474 (citations omitted) (defendant under

"investigative detention" and not "under arrest" despite being handcuffed at scene; was not "under arrest" until the detention had become unreasonably intrusive—i.e. when vehicle stop was completed and he was transported to the detective division). In any event, unlike his co-defendants, Alverson was caught driving without a license and thus officers had every right to arrest him immediately. (Tr.VI at 15)

cense.[8] Approximately ten minutes into his detention, the officers learned that Alverson had outstanding misdemeanor arrest warrants.[9] He had not been detained for an unreasonable amount of time before these facts, which gave officers every right to arrest him, came to light.[10] Accordingly, Alverson's subsequent arrest and transportation to the detective division of the Tulsa Police Department was legal, and the confession which followed was not tainted by any illegality in his arrest. This proposition must be denied.

■ ¶ 15 In his third proposition of error, Alverson complains that Detective Makinson improperly provided the jury with an irrelevant and prejudicial "lengthy narrative" regarding what was depicted on the store surveillance videotape. The record is clear that Detective Makinson knew what all four defendants looked like and had viewed the entire videotape before he testified. For the jury's benefit, Makinson identified all four defendants on the tape as it was being played. He discussed the shift change that occurred, and he also testified regarding what could be heard on the tape as the beating took place.

¶ 16 The detective's identifications of the defendants, discussion of what was happening during the shift change, and testimony concerning the audible sounds on the tape were all helpful to the jury. They were based on Makinson's observations of the defendants prior to watching the videotape and his knowledge of the events that had transpired based on his investigation of the crime. Accordingly, his explanatory testimony was properly admitted as lay witness opinion testimony.[11]

¶ 17 Alverson attempts to distinguish this case from that of *United States v. Jones*,[12] which held similar explanatory testimony regarding an audio tape admissible. *Jones* upheld the testimony of a witness who heard the statements on an unintelligible tape as they were being recorded; his testimony rendered a difficult to understand tape recording admissible. Alverson incorrectly asserts that *Jones* stands for the proposition that only someone actually present when the recording is made can testify to its contents. On the contrary, *Jones* simply upheld the admission of an audio-tape recording where one familiar with its contents testified and the recording gave independent support to his testimony.[13]

¶ 18 In this case, Detective Makinson was familiar with all four defendants and was in a position to identify them when he saw them on the videotape. Testimony from Makinson and other witnesses, regarding when the shift change took place and the time of the victim's assault, was corroborated by the videotape. We find no error in the playing of the videotape or in Makinson's explanatory testimony regarding that tape. The "narrative" was similar to the preparation of an accurate transcript for the jury to use as a reference tool when listening to an audiotape.[14] More accurately, as already stated above, it was lay witness opinion testimony that was properly admitted because it: (1)

8. Tr.VI at 15.

9. Alverson claims in his brief that officers did not learn of the existence of these warrants until late that night, after Alverson had been transported to the police station. However, Sgt. Allen testified at trial that he was sure he and the other arresting officers knew about Alverson's arrest warrants at the scene, before they transported him. (Tr.VI at 13; Tr.VII at 4–5)

10. *Cf. Brown, supra.* Alverson's reliance on *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) and other cases involving warrantless arrests is misplaced.

11. *Green v. State*, 1985 OK CR 126, ¶ 20, 713 P.2d 1032, 1039 *overruled on other grounds*, *Brewer v. State*, 1986 OK CR 55, ¶ 51 n. 1, 718 P.2d 354, 365 n. 1 and *cert. denied*, 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 165 (1986); 12 O.S. 1991, § 2701. The only arguably improper comment was the detective's statement about "the bat hitting the victim in the head." However, defense counsel's objection was sustained and he specifically requested the jury not be admonished to disregard the comment. In any event, the comment was not a serious error which would justify relief.

12. 540 F.2d 465 (10th Cir.1976), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977).

13. *Id.* at 470.

14. *See, e.g.*, *Brassfield v. State*, 1986 OK CR 73, ¶ 6, 719 P.2d 461.

was rationally based on the perception of the witness; and (2) aided the trier of fact.[15]

¶ 19   In propositions seven and eight, Alverson complains about the introduction of DNA evidence. Alverson argues in proposition seven that the trial court erroneously admitted Polymerase Chain Reaction (PCR) DNA test results without first holding a *Daubert*[16] hearing. Alverson did not object to the admission of this evidence at trial, waiving all but plain error.

¶ 20   We have recently visited this issue and determined that PCR DNA testing is reliable and admissible in the State of Oklahoma.[17] Alverson concedes this point, but argues that the PCR DNA evidence in this case came from an expert who did not explain how she performed the statistical probability analysis or describe the statistical information on which it was based. Assuming without deciding that the State must elicit such testimony before statistical probability evidence will be admitted, the record reflects that Brown did in fact testify sufficiently regarding these issues.[18] Thus, the DNA evidence was properly admitted.

¶ 21   In Proposition eight, Alverson contends the State failed to establish a sufficient chain of custody for items tested by OSBI serologist Jamie Yorkston. Yorkston examined the following items which had been seized from Wilson's porch: (1) one half of the broken handcuffs (the other half was found at the scene near the victim's body); (2) Yost's QuikTrip jacket; (3) Wilson's Nike jacket; (4) the metal bat; and (5) a piece of broken glass (which matched three pieces of glass found in the QuikTrip cooler). Alverson complains the State failed to demonstrate that this evidence, and samples taken from it, had not been contaminated or al-

tered.   Alverson did not object on these grounds during Yorkston's testimony, waiving all but plain error.[19]

¶ 22   "The purpose of the chain of custody rule is to guard against substitution of or tampering with the evidence between the time it is found and the time it is analyzed."[20]   Although the State has the burden of showing the evidence is in substantially the same condition at the time of offering as when the crime was committed, it is not necessary that all possibility of alteration be negated.[21]   If there is only speculation that tampering or alteration occurred, it is proper to admit the evidence and allow any doubt to go to its weight rather than its admissibility.[22]

¶ 23   In this case, witnesses including five detectives and one police officer testified that the items in question were in the same condition as when they were found. In addition, the witnesses indicated the items were properly marked for identification and sent to the OSBI. Yorkston's testimony explained how the evidence was handled within the OSBI. Given this testimony, we find the evidence was properly admitted against Appellant.

## IV.   FIRST STAGE JURY INSTRUCTIONS

¶ 24   In his ninth proposition of error, Alverson contends a second degree murder instruction should have been given. He claims he merely intended to commit robbery by force or fear, the predicate felony for the lesser offense of second degree felony murder, and not robbery with a dangerous weapon, which is the predicate felony for first degree felony murder. We note that Alver-

---

15.   *Green,* 1985 OK CR 126 at ¶ 20, 713 P.2d at 1039.

16.   *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).   This Court adopted *Daubert* in *Taylor v. State,* 1995 OK CR 10, ¶ 15, 889 P.2d 319, 328–29 (holding RFLP DNA testing admissible).

17.   *Wood v. State,* 1998 OK CR 19, ¶ 40, 959 P.2d 1, 11.

18.   Tr.VI at 234–35.

19.   *Minter v. State,* 1988 OK CR 116, ¶ 5, 756 P.2d 10, 11.

20.   *Middaugh v. State,* 1988 OK CR 295, ¶ 16, 767 P.2d 432, 436 (citation omitted).

21.   *Driskell v. State,* 1983 OK CR 22 ¶ 59, 659 P.2d 343, 354.

22.   *Contu v. State,* 1975 OK CR 55, ¶ 13, 533 P.2d 1000, 1003.

son did not request an instruction on murder in the second degree, waiving all but plain error.

¶ 25 In this case, the facts are undisputed that the victim was beaten to death with a baseball bat, which is a dangerous weapon. This weapon was used so the robbery could be completed. Where a robbery is committed with a dangerous weapon, second degree felony murder cannot be accomplished because the offense becomes one of first degree felony murder.[23] Accordingly, an instruction on second degree felony murder would have been improper.[24] We find no error here.

## V. ISSUES ADDRESSING BOTH FIRST AND SECOND STAGE

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 26 In his fifth proposition of error, Alverson contends his attorney was ineffective. Our review of an ineffective assistance of counsel claim begins with a presumption of competence, and the burden is on the defendant to demonstrate both deficient performance and resulting prejudice.[25] There is a strong presumption that counsel's conduct was professional, and the defendant must overcome the presumption that counsel's conduct equaled sound trial strategy.[26] If we can dispose of the claim on the ground of lack of prejudice, we will not determine whether trial counsel's performance was deficient.[27]

¶ 27 Alverson contends first that his attorney was ineffective because he stated during voir dire, "And I anticipate, based on the evidence, that you will be in a second stage, looking at punishment."[28] This was asked in the context of exploring a potential juror's feelings toward the death penalty. Throughout the trial, counsel's strategy was to argue Alverson was less culpable than the others in Yost's murder. Given the overwhelming evidence of guilt, including the store surveillance tape and Alverson's confession, counsel's sound trial strategy of attempting damage control regarding punishment did not render him ineffective.

¶ 28 Next, Alverson contends his attorney was ineffective because he neither cross-examined the State's DNA witnesses nor offered any defense to the DNA evidence presented. Alverson concedes that the State's case did not "hinge" on the DNA evidence.[29] The State's DNA evidence was that the blood found on the items seized from codefendant Wilson's porch was that of the victim. We fail to see how the outcome of this trial would have differed had Alverson's counsel cross-examined these witnesses or presented evidence refuting the DNA results. Accordingly, Alverson was not prejudiced by counsel's performance and relief is not warranted.[30]

¶ 29 Alverson also contends that his attorney was ineffective because he conceded the crime was heinous, atrocious or cruel. In making this argument, Alverson takes one sentence from second stage closing arguments completely out of context. Coun-

23. *Foster v. State*, 1986 OK CR 19, ¶ 31, 714 P.2d 1031, 1039, *cert. denied*, 479 U.S. 873, 107 S.Ct. 249, 93 L.Ed.2d 173, *citing* 21 O.S.1981, § 701.7(B).

24. *Id., citing Carlile v. State*, 1972 OK CR 22, 493 P.2d 449 (holding lesser included offenses should only be given to the jury when warranted by the evidence).

25. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Lambert v. State*, 1994 OK CR 79, ¶ 60, 888 P.2d 494, 506.

26. *Rogers v. State*, 1995 OK CR 8, ¶ 5, 890 P.2d 959, 967, *cert. denied*, 516 U.S. 919, 116 S.Ct. 312, 133 L.Ed.2d 215 (1995).

27. *Lambert*, 1994 OK CR 79 at ¶ 60, 888 P.2d at 494, *citing Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069–70. *See also Coleman v. State*, 1984 OK CR 104, ¶ 9, 693 P.2d 4, 7 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

28. Tr.III at 304.

29. Br. of Appellant at 30.

30. *Lambert*, 1994 OK CR 79 at ¶ 62, 888 P.2d at 506.

sel's exact argument was that while the murder was cruel and atrocious, Alverson was not a major participant. He argued Alverson only intended to commit robbery, not murder, and that his participation was minimal. Arguments as to one defendant's lesser culpability are common in the second stage of capital trials and will not constitute ineffective assistance of counsel.[31]

¶ 30 Next, Alverson complains counsel was ineffective for failing to properly prepare one of his second stage witnesses. Social worker Beverly Jean Carlton was called to present Alverson's social history to the jury.[32] This witness was not aware of a pre-sentence report prepared from one of Alverson's prior convictions. Because the jury rejected the continuing threat aggravator, we dispose of this claim on a lack of prejudice.[33]

¶ 31 Finally, Alverson takes issue with counsel's failure to investigate alleged head injuries Alverson had received as a child. Counsel did request funds to hire an expert to look into this issue, which was properly denied by the trial court.[34] Because

Alverson has presented no evidence to support his contention that ordinary injuries he received as a child resulted in inorganic brain damage, we dispose of this claim on a lack of prejudice as well.[35]

## B. GRUESOME PHOTOGRAPHS

¶ 32 In his second proposition of error, Alverson challenges the admissibility of several photographs depicting the victim and his wounds. The admission of photographs is within the trial court's discretion, and this Court will not disturb that ruling absent an abuse of discretion.[36] This Court has previously held that the question is whether pictures are so unnecessarily hideous as to produce an unfair impact on a jury.[37]

¶ 33 Alverson contends State's Exhibit Nos. 93, 95, 99, 100, 101, 102, and 104 were all improperly admitted into evidence during the first stage of trial.[38] Exhibit Nos. 93 and 95 were properly introduced to corroborate the medical examiner's testimony concerning defensive wounds to the victim's

---

31. *Rogers*, 1995 OK CR 8 at ¶ 5, 890 P.2d at 967 (presumption that counsel's conduct was sound trial strategy).

32. The trial judge granted Alverson's motion requesting State funds to hire Carlton, a licensed clinical social worker, in preparing his defense. (O.R.II at 287–88)

33. *Lambert*, 1994 OK CR 79 at ¶ 60, 888 P.2d at 506, *citing Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069–70.

34. The defense relied on the results of the MMPI–2 which the previously appointed expert, Jean Carlton, had administered. (O.R.II at 328) Carlon admitted during her testimony that she was not even qualified to administer the MMPI. (Tr.IX at 218–19) Even if she had been qualified, the trial court correctly ruled that the MMPI does not indicate whether a person has neurological problems, and additionally, none of the doctors who examined Alverson following his run-of-the-mill childhood accidents indicated the possibility that they had created neurological damage or that an evaluation for neurological damage was necessary. (Tr.I at 225–29) Accordingly, the trial court did not abuse its discretion in denying Alverson's motion for expert assistance at State expense. *Rogers v. State*, 1995 OK CR 8, ¶ 4, 890 P.2d 959, 967 (before a defendant may qualify

for court-appointed expert assistance, he must make a showing of need and show that he will be prejudiced by the lack of expert assistance), *citing Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

35. *Lambert*, 1994 OK CR 79 at ¶ 62, 888 P.2d at 506. In any event, some evidence regarding head injuries was presented in second stage for the jury to consider. The testifying witness acknowledged the injuries were relatively minor— only one football injury required medical care which Alverson received, with no notation that permanent or even serious damage had resulted. (Tr.IX at 158–59, 167, 180–81)

36. *Le v. State*, 1997 OK CR 55, ¶ 25, 947 P.2d 535, 548, *cert. denied*, —— U.S. ——, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998).

37. *Id.*

38. Alverson also references State's Exhibit No. 113 (an overhead view of the victim's head) in his brief, but states only that it was "arguably probative." (See Brief of Appellant at 17) We take this to mean that Alverson does not object to its introduction on appeal. In any event, our independent review of the case reveals no error in its introduction.

hands.[39] Exhibit Nos. 99, 100, 101 and 102 all show multiple injuries to the victim's face and head from different angles and are duplicative.[40] While they can be characterized as gruesome because of the extensive damage that was done to the victim during his beating, "they accurately depict the result of Appellant's actions and the condition of decedent."[41] The medical examiner testified that these photographs were the best method of illustrating the nature and extent of the victim's injuries to the jury.[42] We find the probative value of all these exhibits was not substantially outweighed by the danger of unfair prejudice, and the trial court did not abuse its discretion in admitting them.

¶ 34 Alverson also contends State's Exhibits Nos. 97 and 115 were improperly admitted in the second stage of trial. Exhibit No. 97 depicts a cut finger on the victim's right hand. This cut showed the extent of the victim's defensive wounds in more detail than the photos admitted in the first stage of trial. It was relevant to show that the victim was conscious and suffered prior to his death. We find its probative value was not outweighed by the danger of unfair prejudice. Accordingly, its admission was not error.

¶ 35 Exhibit No. 115 is more troublesome. It is a color photograph of the victim's brain cavity, the top of his skull having been removed by the medical examiner. At the pre-trial motion hearing wherein the trial court ruled it admissible, the State argued its purpose was to illustrate the massive crack the victim suffered from one side

of his skull to the other.[43] The medical examiner used it in his second stage testimony for the ostensible purpose of showing the jury this "hinge fracture." However, it more amply showed the handiwork of the medical examiner, as he had sawed off and removed the top of the victim's skull and also removed the victim's brain.[44] The photograph is nothing more than an appalling close-up view of the cavity of the victim's skull in gruesome detail. What little probative value it may have had was certainly outweighed by the danger of unfair prejudice. We find the trial court erred in allowing this photograph into evidence.[45]

¶ 36 We now must determine whether the error was harmless. The photograph was admitted in support of the especially heinous, atrocious and cruel aggravator. Other properly admitted photographs which showed wounds to the victim's head and hands were far grimmer than this sterile, clinical photograph. While this particular photograph was more prejudicial than probative, given the other photographs which were properly admitted, we cannot find the death sentence was imposed because of its introduction.[46] This is especially true given the State's overwhelming evidence that the victim suffered prior to his death,[47] including the surveillance tape on which one can hear the victim screaming for help and moaning. We can say with the utmost confidence that the admission of this photograph did not

**39.** *Romano v. State,* 1995 OK CR 74, ¶ 46, 909 P.2d 92, 114, *cert. denied,* 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996)(pictures depicting nature, extent and location of wounds, including defensive wounds, held relevant); *Wood v. State,* 1976 OK CR 311, ¶ 22, 557 P.2d 436, 442 (pictures properly admitted where they tended to corroborate pathologist's testimony concerning defensive wounds to head and hands).

**40.** No. 99 shows the right side of the victim's face; No. 100 shows the left side of the victim's face; No. 101 shows a full frontal view of the victim's face; No. 102 shows the back side of the victim's head. Different injuries can be seen in each of the pictures.

**41.** *Romano,* 1995 OK CR 74 at ¶ 46, 909 P.2d at 114.

**42.** Tr.X at 3–4.

**43.** Tr. of 4/29/97 at 122–23.

**44.** Tr. of 5/19/97 at 44. In fact, it is impossible to distinguish between where the hinge fracture began and ended and where the medical examiner's sawing took place.

**45.** *Oxendine v. State,* 1958 OK CR 104, ¶ 8, 335 P.2d 940, 943 (Okl.Cr.1958) (holding color pictures of nude victim showing results of autopsy were so shocking, unnecessary and highly prejudicial as to force a reversal).

**46.** *Wilson v. State,* 1998 OK CR 73, ¶ 94, 983 P.2d 448.

**47.** See Proposition X, *infra.*

deprive Alverson of a substantial right.[48] Accordingly, this error is harmless.

## C. PROSECUTORIAL MISCONDUCT

¶ 37 Prosecutorial misconduct is the subject of Alverson's fourth proposition of error. We will address each alleged instance of misconduct in the order raised.

¶ 38 Alverson first challenges the prosecutor's "running narrative" of what appears on the store surveillance videotape. Alverson takes issue specifically with: (a) the prosecutor telling the jury that an image on the screen was Alverson since Alverson was not identified at all of the points referenced by the prosecutor in closing argument; (b) the prosecutor arguing that one can see Alverson raising his arms for the purpose of "signaling" the others that it was time for the take down; and (c) the prosecutor's claim that while outside, Alverson handed the baseball bat to Harjo.

¶ 39 We begin by noting the trial court correctly ruled that the videotape was a non-testimonial exhibit.[49] As such, Alverson's attempts to distinguish this videotape from a photograph, which he concedes could have been referred to in closing arguments, are unsuccessful. This exhibit was properly utilized just like any other exhibit the parties could have used and referred to in closing arguments. The prosecutor was free to follow Alverson's image throughout the tape and comment on what that tape

showed from the government's perspective; in fact, Alverson's attorney did exactly the same from the defense's perspective.[50]

¶ 40 Additionally, it was a fair inference drawn from the evidence that when Alverson raised his arms, it was to signal the others to do the take down, as Yost was attacked immediately following this gesture. The prosecutor's argument that Alverson handed Harjo the bat was likewise a reasonable inference from the evidence. State's witness Mandy Rumsey testified that she saw Alverson getting into the vehicle containing the bat around the time of the murder; she also heard him tell Harjo to "come on." [51] The store surveillance videotape shows Alverson leading the way when he and Harjo exit and re-enter the store with the baseball bat. Because Alverson appears to be the leader, one can fairly infer that he retrieved the bat and handed it to Harjo while they were still outside.[52] We find nothing inappropriate here.

¶ 41 Alverson also contends the prosecutor improperly punctuated his argument while swinging the baseball bat in front of the jury and striking the floor three times. Alverson did not object when this occurred, waiving all but plain error. We find the prosecutor's use of the bat in this manner, while theatrical and graphic, fell within the wide latitude permitted during closing argument.[53]

---

48. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); 20 O.S.1991, § 3001.1 (no judgment shall be set aside or new trial granted by any appellate court unless the error complained of "has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right.").

49. *Duvall v. State,* 1989 OK CR 61, ¶ 11, 780 P.2d 1178 (holding audio tape recording of Appellant selling cocaine to another was not testimony by a witness and thus was to be treated as any other exhibit).

50. In first stage, Alverson's lawyer argued the videotape showed Alverson was merely a follower and that Wilson and Brown were the main players in this murder. (Tr.VIII at 37) In second stage, he argued the videotape showed Alverson was merely a lookout who expressed surprise ("we got a problem") when things got out of hand. (Tr.X at 44–46)

51. Tr.IV at 100.

52. *See Hooper v. State,* 1997 OK CR 64, ¶¶ 53–56, 947 P.2d 1090, 1110–11, *cert. denied,* — U.S. ——, 118 S.Ct. 2353, 141 L.Ed.2d 722 (1998) (finding prosecutor's theory of how victim died was not inflammatory speculation, but rather a reasonable inference from the evidence).

53. *Ellis v. State,* 1992 OK CR 45, ¶ 12, 867 P.2d 1289, 1297, *cert. denied,* 513 U.S. 863, 115 S.Ct. 178, 130 L.Ed.2d 113 (1994) (holding prosecutor's action of "dry-firing" gun while pointing it down may have been overly graphic but was still within the wide latitude permitted during closing argument). Just as in *Ellis,* Alverson's attempts to compare this prosecutor's conduct to that of the prosecutor in *Brewer v. State,* 1982 OK CR 128, 650 P.2d 54, *cert. denied,* 459 U.S. 1150, 103 S.Ct. 794, 74 L.Ed.2d 999 (1983) is tenuous and unpersuasive.

¶ 42 Alverson continues to allege prosecutorial misconduct in the second stage proceedings. He argues the prosecutor blatantly misstated evidence twice: once when he argued that Alverson had told Detective Folks that he planned on killing Yost, and again when he argued that Alverson had admitted to Folks that he knew they were going to rob and kill Yost.

¶ 43 In his statement to Detective Folks, Alverson stated the robbery had been planned about two weeks in advance. He did not go so far as to concede the murder was planned. Therefore, the prosecutor's argument was inaccurate. However, in viewing the record as a whole, we find the error harmless. The trial court reminded the jury after each of defense counsel's objections that the lawyers' statements were not evidence. Additionally, defense counsel argued that his client had not made as sweeping a confession as the prosecutor mistakenly alleged. "Allegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect was such to deprive the defendant of a fair trial." [54] Because we do not find that the inappropriate comments deprived Appellant of a fair trial or affected the jury's assessment of the death penalty, relief is not warranted.[55]

¶ 44 Alverson further alleges the prosecutor improperly attempted to evoke sympathy for the victim when he stated, "you can let sympathy enter your deliberations at this point." [56] No objection was made at trial, waiving all but plain error. We find no error here. This statement was made in the context of discussing the defendant's mitigating evidence. The prosecutor discussed how Alverson's family had come to court to plead for his life, then argued, "you can let sympathy enter your deliberations at this point. But I submit to you that this is not about forgiveness. It's not about sympathy." [57] When viewed in context, it is clear that the prosecutor was discussing sympathy for the defendant, not the victim. As such, the statement cannot possibly be viewed as an attempt to evoke victim sympathy.

¶ 45 Alverson also takes issue with the prosecutor's description of the victim as "This innocent man, trying to make a living for his wife and two baby boys." [58] Once again, no objection was lodged at trial, waiving all but plain error. We find this description was proper as it was based on the evidence. It is far less of an improper solicitation for victim sympathy than other statements upheld by this Court.[59]

¶ 46 Likewise, we find the prosecutor did not ask the jury to place themselves in the position of the victim when he asked, "Have you ever taken a metal baseball bat, take it in your hand ... and just barely, barely tap the metal baseball bat on your skull, just barely. It hurts." [60] This argument was made to argue the victim felt pain prior to his death, a wholly permissible area of discussion during sentencing stage closing argument.

¶ 47 We have reviewed each of the complained-of statements and find none resulted in a miscarriage of justice, deprived the appellant of a substantial trial right, or had any impact whatsoever on the judgment or sentence.[61] Accordingly, this proposition is denied.

**54.** *Smith v. State*, 1996 OK CR 50, ¶ 29, 932 P.2d 521, 531, *cert. denied*, 521 U.S. 1124, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997), *citing Duckett v. State*, 1995 OK CR 61, 919 P.2d 7, 19, *cert. denied*, 519 U.S. 1131, 117 S.Ct. 991, 136 L.Ed.2d 872 (1997).

**55.** *Id.*

**56.** Tr.X at 37.

**57.** *Id.*

**58.** Tr.X at 68.

**59.** *Hooper*, 1997 OK CR 64 at ¶ 53, 947 P.2d at 1110 (prosecutor's statement that victim "was immersed in a child's worst nightmare of being chased by an evil monster trying to kill her" and request that the jury imagine what she went through held to approach improper solicitation of sympathy for the victim, but not improper as it was based on the evidence presented and on the State's theory of the victim's death).

**60.** Tr.X at 67.

**61.** *Hawkins v. State*, 1994 OK CR 83, ¶ 30, 891 P.2d 586, 595, *cert. denied*, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995), *citing Staggs v. State*, 1991 OK CR 4, 804 P.2d 456; *Ashinsky v. State*, 1989 OK CR 59, 780 P.2d 201; *Fisher v. State*, 1987 OK CR 85, 736 P.2d 1003.

## V. SECOND STAGE ISSUES

### A.

¶ 48   In proposition ten, Alverson argues: (a) the State presented insufficient evidence to show the victim was conscious for a significant length of time before losing consciousness so as to render his death "one preceded by torture or serious physical abuse"; and (b) even if the death was especially heinous, atrocious or cruel, the State failed to show Alverson caused it to be so.

¶ 49   When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, this Court will view the evidence in the light most favorable to the State and determine whether any competent evidence supports the State's charge that the aggravating circumstance existed.[62]   The standard for determining the existence of the aggravator "especially heinous, atrocious or cruel" is as follows:

> [T]his Court has limited this aggravating circumstance to cases in which the State proves beyond a reasonable doubt that the murder of the victim was preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty. "Absent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met." As to the extreme mental cruelty prong of this aggravating circumstance, "torture creating extreme mental distress must be the result of intentional acts by the defendant. The torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing. Analysis must focus on

the acts of the defendant toward the victim and the level of tension created." [63]

¶ 50   In this case, the State's evidence was that Alverson and his three co-defendants jumped Yost and dragged him into the back cooler.  Alverson and Harjo then left the cooler to go outside and retrieve handcuffs and a baseball bat.  It is safe to infer that restraints were necessary because the victim was struggling.  One can hear the victim screaming for help on the surveillance tape as Alverson and Harjo exit the store.  We find that even before the baseball bat was brought into the cooler, the victim had already "suffered the extreme mental anguish of being held captive, knowing that his ultimate fate rested in the hands of his attackers whom he could identify if left to live." [64]

¶ 51   Once Alverson and Harjo returned to the cooler with the baseball bat, over forty "pings" could be heard as the brutal beating took place.  Although the medical examiner testified that many of the blows could have caused instantaneous death or unconsciousness, the defensive wounds on the victim's hands plainly demonstrate that he did not lose consciousness swiftly, but rather was painfully aware of what was happening to him.[65]  Additionally, a hinge from the handcuffs was removed from the victim's skull, indicating at some point he had placed his hands between the bat and his head in a defensive posture.  We find ample evidence of both extreme mental anguish and conscious physical suffering prior to the victim's death to support this aggravating circumstance.[66]

62.   *Hain v. State*, 1996 OK CR 26, ¶ 62, 919 P.2d 1130, 1146 (citation omitted), *cert. denied*, 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996).

63.   *Cheney v. State*, 1995 OK CR 72 ¶ 15, 909 P.2d 74, 80 (citations omitted).

64.   *Brown v. State*, 1998 OK CR 77, ¶ 70, 983 P.2d 474. This alone is sufficient to uphold the jury's finding of this aggravating circumstance. *See Hawkins v. State*, 1994 OK CR 83, ¶ 45, 891 P.2d 586, 597, *cert. denied*, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995) (upholding heinous, atrocious or cruel aggravator even

though victim did not suffer serious physical abuse where she was subjected to extreme mental cruelty).

65.   *See Walker v. State*, 1994 OK CR 66, ¶ 61, 887 P.2d 301, 318, *cert. denied*, 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995) (while medical examiner testified many of the wounds may have been inflicted while victim was unconscious, the many defensive wounds she incurred established that she was quite alert and active during much of the attack).

66.   *Cheney*, 1995 OK CR 72 at ¶ 15, 909 P.2d at 80.

¶ 52 Alverson argues in the alternative that even if the evidence is sufficient to support the heinous, atrocious and cruel aggravator, it is legally insufficient to show *he* inflicted the serious physical abuse or intended that it take place.[67] We disagree. The evidence showed Alverson was a substantial participant in the murder. He actively participated in the initial attack wherein the victim was dragged into the cooler. Alverson came out of the cooler to straighten up store merchandise that he and his cohorts had knocked off the shelves during the attack, then re-entered the cooler. Alverson actively participated in bringing the baseball bat, and arguably the handcuffs, into the cooler. Although Harjo carried the bat, Alverson led the way outside the store to retrieve it and back inside to the cooler. By introducing a dangerous weapon into the robbery, Alverson "created a desperate situation inherently dangerous to human life."[68] Moreover, Alverson was inside the cooler when some of the beating was administered.[69] Accordingly, we find the evidence clearly showed that even if Alverson did not deliver the blows himself, he knew the murder was to take place and actively participated in it.[70]

¶ 53 In his eleventh proposition of error, Alverson contends: (a) as applied by this Court, the especially heinous, atrocious or cruel aggravating circumstance does not perform the constitutionally required narrowing process; and (b) the jury instructions defining this aggravator failed to perform the constitutionally mandated narrowing process.

¶ 54 The law in Oklahoma is well settled that this aggravating circumstance, as limited by *Stouffer v. State*[71] to those murders preceded by torture or serious physical abuse, is sufficiently channeled to satisfy constitutional constraints.[72] We decline to revisit this issue.

¶ 55 The trial court gave Alverson's jury the standard instruction defining heinous, atrocious or cruel. This instruction states:

As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse.[73]

¶ 56 We have previously upheld the constitutionality of this instruction, finding the second paragraph limits the use of this aggravating circumstance to cases where the State proves beyond a reasonable doubt that the murder of the victim was preceded by torture or serious physical abuse, "which may include the infliction of either great physical anguish or extreme mental cruelty."[74] The jury instruction is sufficient

67. *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (stating that before a defendant is eligible for the death penalty, the State must prove at least that the defendant substantially participated in the killing to the degree that he exhibited reckless indifference to the loss of human life.).

68. *Hain,* 1996 OK CR 26 at ¶ 60, 919 P.2d at 1146 (holding defendant's conduct in helping create a desperate situation inherently dangerous to human life showed he was a major participant in the felony, knew the killing would take place, and displayed reckless indifference to human life).

69. *Cf. Barnett v. State,* 1993 OK CR 26, ¶ 32, 853 P.2d 226, 234 (evidence sufficient to support heinous, atrocious and cruel aggravator even though the vast majority of the acts upon which this aggravator were based were perpetrated

against the victim in the absence of the appellant).

70. *Hain,* 1996 OK CR 26 at ¶ 60, 919 P.2d at 1146.

71. 1987 OK CR 166, 742 P.2d 562, *cert. denied,* 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779.

72. *Hawkins,* 1994 OK CR 83 at ¶ 42, 891 P.2d at 596, *citing Romano v. State,* 847 P.2d 368 (Okl. Cr.1993); *Woodruff v. State,* 846 P.2d 1124 (Okl. Cr.1993); *Fisher v. State,* 845 P.2d 1272 (Okl.Cr. 1992), *cert. denied,* 509 U.S. 911, 113 S.Ct. 3014, 125 L.Ed.2d 704 (1993).

73. OUJI–CR 2 nd 4–73; O.R.III, 417.

74. *Le v. State,* 1997 OK CR 55, ¶ 43, 947 P.2d 535, 552, *cert. denied,* —— U.S. ——, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998) (citations omitted).

without further explanation, since "torture or serious physical abuse" does not require additional definition.[75]

■ ¶ 57  Additionally, Alverson argues this Court's practice of interpreting this aggravating circumstance on a case-by-case basis should be declared unconstitutional. We have previously rejected the notion that the criteria for this aggravator may be mechanically applied to all murder cases.[76] "Just as the jury in each case must decide, based on the facts of that case, whether a defendant meets the specific criteria for this aggravating circumstance, so must this Court review those jury determinations on an individual basis."[77]

### B.

■ ¶ 58  In proposition twelve, Alverson argues that the death penalty scheme in Oklahoma is unconstitutional as applied to the facts of this case. He asks this Court to adopt the American Bar Association's February 3, 1997 resolution recommending a moratorium on the imposition of the death penalty.[78]  Despite the ABA's recommendation, relief will not be granted on the basis of discrimination unless the Appellant can show the jurors in his particular case acted with discriminatory purpose.[79]

¶ 59  In support of his claim that the death penalty was applied unconstitutionally to him, Alverson argues that: (1) of the four codefendants in this case, only the African Americans received death while the fourth, of Native American descent, was spared; (2) out of the seventy-five person jury pool, only five African Americans were present and none made it to his jury after one black juror was excused because she stated she could not impose the death penalty; and (3) because several jurors were excused for cause after stating they could not impose the death penalty, Alverson was left with a "pro-death penalty" jury.

■ ¶ 60  In addressing Alverson's first complaint, that only his non-African American codefendant escaped the death penalty, we find that this is insufficient to prove Alverson's particular jury acted with discriminatory purpose. We will not speculate as to why this occurred, as aggravating and mitigating evidence is different in every case, even in cases of co-defendants.[80]

■ ¶ 61  Regarding Alverson's complaint that there were not enough African Americans in his jury pool, we repeat once again that Oklahoma's method of jury selection is constitutionally firm.[81]  Alverson has presented us with no new arguments or evidence to persuade us to reconsider the issue. He has not shown that Oklahoma's jury selection process excludes African Americans or any other distinctive group in the community.[82]

75. *Id.*

76. *Id.* at ¶ 45, 947 P.2d at 553.

77. *Id.*

78. The resolution cites alleged racial and economic discrimination in the application of the death penalty as grounds for the moratorium.

79. *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)(statistical study indicating that death penalty in Georgia was applied in racially discriminatory manner was insufficient to support inference that the decision makers in the case of black defendant sentenced to death for murder of white police officer acted with discriminatory purpose). General, non-case-specific objections to the death penalty are best made to the legislature, a fact the ABA resolution recognizes. Leslie A. Harris, *The ABA Calls for a Moratorium on the Death Penalty: The Task Ahead—Reconciling Justice with Politics*, FOCUS SPRING 1997, Vol. XII, Number 2 ("if the resolution is to have lasting significance, it is lawmakers—not lawyers—who will have to embrace reform * * * the ABA must direct its message to the American people, as well as to the politicians.").

80. We do note that Harjo is the youngest of the four defendants, as well as the only one who did not give a statement to police confessing or incriminating himself.

81. *Hooker v. State*, 1994 OK CR 75, ¶ 21, 887 P.2d 1351, 1358, *citing Trice v. State*, 853 P.2d 203, 207 (Okl.Cr.), *cert. denied*, 510 U.S. 1025, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993), and *Fox v. State*, 779 P.2d 562 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990).

82. To establish a prima facie case of a violation of the fair cross-section requirement, one must show (1) that the group alleged to be excluded is

¶ 62 Moreover, the fact that prospective juror Smith, an African–American, was excused for cause does nothing to bolster Alverson's claim. The trial court properly excused prospective juror Smith after she stated she opposed the death penalty and would not apply it.[83] Clearly, "her view on capital punishment could have substantially impaired the performance of her duties as juror in accordance with the instruction and oath." [84]

¶ 63 Finally, we reject Alverson's contention that the excusal of jurors who stated they would not consider the death penalty left him with a "pro-death penalty" jury. All the jurors who served on this case stated they could consider all three penalties provided by law.[85]

¶ 64 Having rejected all of Alverson's arguments in support of his claim that the death penalty was applied unconstitutionally to him, we find this proposition lacks merit.

## C.

¶ 65 In his thirteenth proposition of error, Alverson takes issue with the trial court's anti-sympathy instruction which was incorporated into the second stage instructions. He argues that this instruction prevented the jury from giving effect to mitigating circumstances. We have previously considered and rejected this argument.[86] We adhere to our prior decisions.

¶ 66 In proposition sixteen, Alverson contends the mitigation instructions permitted the jury to ignore mitigating evidence altogether because they did not *require* consideration of mitigation even after the jury determined it existed. We have previously held that instructing the jury that it "must" consider the mitigating evidence presented would be improper, "as that would take away from the jury its duty to make an individualized determination of the appropriate punishment." [87] Thus, the instructions were proper, and this proposition fails.

## D.

¶ 67 In his fourteenth proposition of error, Alverson claims victim impact evidence from the victim's wife and mother should not have been admitted. Both witnesses read prepared statements which the trial court had previously approved.

¶ 68 Victim impact statements and victim impact evidence are admissible in a capital sentencing procedure.[88] Victims may present their rendition of the circumstances surrounding the crime, the manner in which the crime was perpetrated, and recommend a sentence.[89] Victim impact evidence should provide a quick glimpse of the life which the defendant chose to extinguish and may include the financial, emotional, psychological and physical effects of the crime on

a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury selection process. *Hooker v. State,* 1994 OK CR 75, ¶ 21, 887 P.2d 1351, 1358–59, *quoting Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Alverson does not even attempt to make this showing, but rather relies solely on rank speculation that his non-African American jury acted with bias.

83. *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

84. *Robedeaux v. State,* 1993 OK CR 57, ¶ 19, 866 P.2d 417, 424, *cert. denied,* 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994).

85. *Banks v. State,* 1985 OK CR 60 ¶ 8, 701 P.2d 418, 421–422 (a venireperson is only required to be willing to consider all the penalties provided by law and not be irrevocably committed before the trial has begun).

86. *Cannon v. State,* 1998 OK CR 28, ¶ 71, 961 P.2d 838, 855 (citations omitted).

87. *Pickens v. State,* 1993 OK CR 15, ¶ 45, 850 P.2d 328, 339 (Okl.Cr.1993), *cert. denied,* 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994).

88. *Willingham v. State,* 1997 OK CR 62, ¶ 58, 947 P.2d 1074, 1086 (citations omitted).

89. *Id., citing* 22 O.S.Supp.1992, § 984.

the victim's survivors, as well as some personal characteristics of the victim.[90]

¶ 69  However, the Due Process Clause of the Fourteenth Amendment precludes the use of victim impact evidence "that is so unduly prejudicial that it renders the trial fundamentally unfair." [91]  Inflammatory descriptions designed to invoke an emotional response by the jury do not fall under the statutory provision permitting these types of statements; such emotionally charged personal opinions are more prejudicial than probative and are inadmissible.[92]

¶ 70  In this case, Alverson complains that testimony from the victim's wife and mother exceeded the limitations on victim impact evidence imposed by this Court. Specifically, he contends the victim's wife was improperly allowed to testify that: (1) she enjoyed cooking and ironing for the victim; (2) birthdays and holidays were special to the victim; and (3) the victim loved Christmas because he was raised in a family that did not celebrate it.

¶ 71  These comments properly addressed how the victim's death affected his wife emotionally, psychologically and physically. The only testimony which was arguably impermissible was that describing how the victim did not celebrate Christmas as a child.[93] However, considering the testimony as a whole, we find this brief reference was not inflammatory enough to run the risk that the jury's sentence of death was something other than a "reasoned moral response" to the evidence.[94]

¶ 72  Alverson also complains that the victim's mother improperly testified that her son did not cause her problems, had in effect long range plans for his life, had a bright future ahead of him, and had promised to take care of her in her old age.  We disagree that these statements were inappropriate, prejudicial, or inadmissible hearsay. These statements showed the financial and emotional impact of the crime on one of the victim's survivors.  The statement regarding the victim's promise to take care of his mother was not hearsay, as it was not offered to prove the truth of the matter asserted.[95] Rather, it demonstrated the financial, psychological and emotional impact of the victim's death.

¶ 73  Alverson further contends that victim impact evidence as a whole negates the narrowing function death penalty procedures are required to provide.  He argues it operates as a "superaggravator" that overwhelmed his jury in its function of balancing aggravating and mitigating circumstances.  We have consistently rejected this argument.[96]  The State is required to prove at least one aggravator beyond a reasonable doubt before the death penalty may be imposed.[97]

¶ 74  In this case, the trial court specifically instructed the jury that victim impact evidence is not the same as an aggra-

90.  *Conover v. State*, 1997 OK CR 62, ¶ 65, 933 P.2d 904, 920.

91.  *Conover*, 1997 OK CR 62 at ¶ 63, 933 P.2d at 920, *citing Cargle v. State*, 909 P.2d 806, 826 (Okl.Cr.1995), *cert. denied*, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996), *quoting Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991).

92.  *Conover*, 1997 OK CR 62 at ¶ 64, 933 P.2d at 920.

93.  *See Cargle v. State*, 1995 OK CR 77, ¶ 80, 909 P.2d 806, 829 (pointing out victim's attributes as a child "in no way provides insight into the contemporaneous and prospective circumstances surrounding his death").

94.  *Conover*, 1997 OK CR 62 at ¶ 66, 933 P.2d at 921, *citing Payne v. Tennessee*, 501 U.S. 808, 836,

111 S.Ct. 2597, 2614, 115 L.Ed.2d 720 (1991), *quoting California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987).  *See also Cargle*, 1995 OK CR 77 at ¶ 80, 909 P.2d at 829 (testimony, although still emotionally charged, not so inflammatory as to exceed bounds of permissible victim impact evidence), *and Le*, 1997 OK CR 55 at ¶ 54, 947 P.2d at 551 (prosecutor's irrelevant and improper argument did not merit relief where Appellant could not show that it resulted in a verdict which was not a reasoned moral response).

95.  12  O.S.1991, § 2801(3).

96.  *Willingham*, 1997 OK CR 62 at ¶ 61, 947 P.2d at 1086 (citations omitted).

97.  *Id.*

vating circumstance and that they could only consider the aggravating circumstances set forth in the instructions.[98] There is no indication that the jury would not have found the aggravating circumstances but for the victim impact evidence. Accordingly, this proposition is denied.

### E.

■ ¶ 75 In proposition fifteen, Alverson contends the aggravator "to avoid lawful arrest or prosecution" is unconstitutionally vague and overbroad. We have previously held that this aggravating circumstance is sufficiently limited by the requirements that: (a) a predicate crime existed, apart from the murder, from which the defendant sought to avoid arrest/prosecution; and (b) the State presented evidence establishing the defendant's intent to kill in order to avoid arrest/prosecution.[99] There is no reason to revisit the issue. The State presented sufficient evidence to support both prongs of this aggravator. This proposition is without merit.

### VII. CUMULATIVE ERROR

¶ 76 In his seventeenth and final proposition of error, Alverson contends that even if none of the errors standing alone warrant reversal, the combined effect of those errors deprived him of a fair trial and sentencing procedure. Alverson raises three new allegations of error under the rubric of this proposition: (1) that the testimony regarding QuikTrip's policy of giving over money during a robbery without resistance was irrelevant; (2) that the prosecutor's reference to Alverson as a "cold blooded murderer" during the cross-examination of Alverson's father in second stage was improper; and (3) that the prosecutor asked the medical exam-

iner improper questions about the number of blows the victim received and whether or not he suffered.

■ ¶ 77 We begin by noting that Alverson cites no caselaw in support of any of these allegations of error. An appellant must support his or her propositions of error by both argument and citation of authority. If this is not done and a review of the record reveals no plain error, we will not search the books for authority to support appellant's bald allegations.[100] We find none of the complained of instances rise to the level of plain error.[101]

■ ¶ 78 As no single error requires reversal, the proceedings, as a whole, cannot be deemed unfair. "We have consistently held that where there is no individual error there can be no reversal for cumulative error."[102] Alverson's final proposition of error is denied.

### VIII. DOUBLE JEOPARDY

¶ 79 Approximately six months after the filing of his brief, Alverson filed a motion requesting leave to supplement the brief, or, in the alternative, for this Court to address an issue *sua sponte*. We deny Alverson's motion to supplement the brief but will address the issue in question *sua sponte*.

¶ 80 At Alverson's request, the trial court gave two separate verdict forms to the jury regarding Count I, Murder in the First Degree: one for first degree malice murder and one for first degree felony murder (the jury was given a third verdict form for Count II, Robbery with a Dangerous Weapon). The trial court instructed the jury, "if you find that the State has proven beyond a reasonable doubt the elements of Murder in the

---

98. O.R.III at 425–26.

99. *Charm v. State*, 1996 OK CR 40, ¶ 73, 924 P.2d 754, 772 (citation omitted).

100. *Romano v. State*, 1995 OK CR 74, ¶ 92, 909 P.2d 92, 117 (citations omitted).

101. First, evidence of the QuikTrip policy was relevant to show that Alverson and his codefendants planned not only to rob the store, but also to murder Yost. Second, defense counsel's objection to the prosecutor's characterization of Alverson

as a "cold blooded murderer" were sustained, curing any error. Finally, the questions asked of the medical examiner and his responses thereto were properly presented to aid the jury in deciding whether the victim suffered prior to his death in support of the heinous, atrocious or cruel aggravator.

102. *Willingham*, 1997 OK CR 62 at ¶ 72, 947 P.2d at 1088 (citations omitted).

First Degree under either or both principles, you would be authorized to return a verdict of 'guilty' on Count 1." [103] The jury found Alverson guilty of murder under both the felony murder and malice murder theories.[104] They also found him guilty of robbery with a dangerous weapon.[105]

¶ 81 This presents a somewhat novel situation. We have previously held that when a defendant is charged with alternative theories of murder and the jury's verdict form does not specify under which theory, malice murder or felony murder, the defendant is found guilty, then the verdict will be interpreted as one of felony murder.[106] We then must reverse with instructions to dismiss the conviction for the underlying felony, since a defendant cannot be convicted of felony murder and the underlying felony.[107]

¶ 82 However, where the jury has separate verdict forms then an entirely new scenario develops, and the *Munson* analysis is inapplicable. In *Munson*, the use of a general verdict form made it impossible to divine whether the jury had intended to convict the defendant of malice murder or felony murder. In that case, we decided to interpret the verdict as one of felony murder "in order that appellant receive the benefit of the rule that a defendant cannot be convicted of felo-

ny-murder and the underlying felony." [108] Under the situation before us today, we do know what the jury found—that the State had proven the crime of murder in the first degree beyond a reasonable doubt under *both* theories. Accordingly, "interpretation" of the verdict as was done in *Munson* is not necessary. It is clear the jury found Alverson guilty of malice murder as well as felony murder.

¶ 83 The question then arises whether dual findings of guilt raise double jeopardy concerns, and whether the conviction for the underlying felony still stands. We now hold that in situations where the jury finds a defendant guilty of murder in the first degree under both principles of malice murder and felony murder, we will construe the conviction as one of first degree malice murder.[109] The Judgment and Sentence, which states the defendant is guilty of one Count of Murder in the First Degree, eliminates any possible double jeopardy concerns, as the defendant has been found guilty of only one count of murder and sentenced accordingly.[110] He has not been doubly convicted nor doubly sentenced.

¶ 84 Because it is possible to determine that the jury convicted Alverson of malice murder, there is no reason to reverse the robbery conviction.[111] Alverson's convictions

103. O.R.III at 383.

104. O.R.III at 432–433.

105. O.R.III at 434.

106. *Wilson v. State*, 1998 OK CR 73, ¶ 60, 983 P.2d 448, *citing Munson v. State*, 1988 OK CR 124, ¶ 28, 758 P.2d 324, 332, *cert. denied*, 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989).

107. *Id.*

108. *Munson*, 1988 OK CR 124 at ¶ 28, 758 P.2d at 332.

109. Our analysis of this issue in *Hamilton v. State*, 1997 OK CR 14, ¶¶ 29–30, 937 P.2d 1001, 1009, and in *Harjo v. State*, Case No. F–97–1054 (not for publication), was in error. In those cases, we continued "interpreting" the jury's verdict as one of felony murder when interpretation was not necessary because the jury clearly found malice murder *and* felony murder. Our misguided decision to dismiss the underlying felony con-

victions in those cases gave the defendants undue benefit to which they were not entitled. Having realized our error, we will no longer apply the incorrect analysis to this issue.

110. *See, e.g., Fitts v. State*, 982 S.W.2d 175, 179 (Tex.Ct.App.1998) (distinguishing between cases involving convictions for multiple offenses as opposed to multiple theories for same offense). *See also People v. Bigelow*, 229 Mich.App. 218, 220, 581 N.W.2d 744, 745–46 (1998) (per curiam) (no double jeopardy violation where defendant's judgment and sentence was modified to specify that conviction was for one count and one sentence of first degree murder supported by two theories: premeditated murder and felony murder).

111. *Accord State v. Burgess*, 345 N.C. 372, 382, 480 S.E.2d 638, 643 ("if both theories are submitted to the jury and the jury finds the defendant guilty under both theories the underlying felony need not merge with the murder"), *citing State v. Rook*, 304 N.C. 201, 283 S.E.2d 732 (1981), *cert. denied*, 455 U.S. 1038, 102 S.Ct. 1741, 72 L.Ed.2d 155 (1982).

on both counts, Murder in the First Degree and Robbery with a Dangerous Weapon, stand.

## IX. MANDATORY SENTENCE REVIEW

¶ 85  In accordance with 21 O.S. 1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances.  Upon review of the record, we cannot say the sentence of death was imposed because the jury was improperly influenced by passion, prejudice or any other arbitrary factor.

¶ 86  Turning to the second inquiry, we note that the trial court instructed Alverson's jury on three aggravating circumstances. The jury found the existence of two aggravating circumstances:  that the murder was committed to avoid lawful arrest or prosecution, and that the murder was especially heinous, atrocious or cruel.  We find that both the law and the evidence support the jury's determination.  After careful review of the record, we find the sentence of death is factually substantiated and appropriate.

¶ 87  We find no error warranting reversal of the conviction or sentence of death for first degree murder or robbery with a dangerous weapon.  Accordingly, the Judgments and Sentences for the crimes of first degree malice murder and robbery with a dangerous weapon in the District Court of Tulsa County are **AFFIRMED.**

¶ 88  **BILLY DON ALVERSON** was tried by jury for Murder in the First Degree and Robbery with a Dangerous Weapon in Case No. CF–95–1024 in the District Court of Tulsa County before the Honorable E.R. Turnbull, District Judge.  Alverson was sentenced to death for Murder in the First Degree and life for Robbery with a Dangerous Weapon and perfected this appeal.  The Judgments and Sentences are **AFFIRMED.**

STRUBHAR, P.J., and JOHNSON, J., concur.

LUMPKIN, V.P.J., concurs in results.

LILE, J., specially concurs.

LUMPKIN, Vice–Presiding Judge: concurs in results.

¶ 1  I concur in the result reached in this case.  I do not agree with portions of the rationale, however, and therefore I write separately to address those points of disagreement.

¶ 2  First, Appellant in this case was a party to the Petitions for Extraordinary Relief set out in Footnote 2 of the Court's opinion.  The issues raised have been judicially determined.  Within the context of criminal procedure that judgment is *res judicata* and Appellant is procedurally barred from raising the issue a second time.  The opinion confuses collateral estoppel with the doctrine of *res judicata,* i.e. claim preclusion. Rather than use that approach, we should simply state the claim is procedurally barred by *res judicata.*

¶ 3  Second, while I am of the opinion Oklahoma law does not prevent the trial court, in the exercise of its discretion, from impaneling dual juries, I remain skeptical regarding the value of this procedure, especially in capital cases.  Although I do not find reversible error occurred in the instant case, some of the issues raised by Appellant are illustrative of future problems we will likely encounter when dual juries are impaneled. Rather than broadly endorsing the dual jury procedure, as did the majority in *Cohee v. State,* 942 P.2d 211, 213 (Okl.Cr.1997)(Lumpkin, J. Concurring in part, dissenting in part), I will continue to monitor its impact on the trial on a case-by-case basis.

¶ 4  Third, with respect to proposition two, I believe the opinion goes too far in its discussion of post-autopsy photographs. While I agree with the general principal that post-autopsy photographs should be viewed with a certain degree of suspicion because of their potential to be more prejudicial than probative, we must recognize that post-autopsy photographs may have their place in certain cases.  *See Mitchell v. State,* 884 P.2d 1186, 1196–97 (Okl.Cr.1994), *cert. denied,* 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995)(post-autopsy photograph more proba-

tive than prejudicial). In addition, the post-autopsy photograph of the interior of the skull which revealed the hinge type fracture at the base of the skull did not show "the handiwork of the medical examiner." It showed the level of force used by Appellant and his co-defendants as they beat the victim to death. If this injury had been visible on the outside of the victim's body, a photograph of those injuries would have been admissible regardless of how prejudicial it might have been. As the Court recognizes "photographs of the numerous wounds to the victim's head suffered by the victim were properly admitted. These photographs were far more prejudicial than the sterile, clinical photograph of the inside of the victim's skull." (Opinion at pg. ——). I find the photograph was admissible and no error occurred.

¶ 5 Finally, it should be noted the criteria set out in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for evaluating effectiveness of counsel has been further explained in *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Applying the *Lockhart* standard, the record is void of any evidence the trial was rendered unfair and the verdict rendered suspect or unreliable.

LILE, J.: specially concurs.

¶ 1 I concur in the opinion. However, I believe that Exhibit No. 115 was properly admitted. This photo showed the extent of the cranial fracture and its probative value outweighs any unfair prejudice.